# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

| | |
|---|---|
| JANE DOE (C.M.B.), AN INDIVIDUAL, | |
| Plaintiff, | |
| v. | CIVIL ACTION NO: |
| WYNDHAM HOTELS & RESORTS, INC.; WYNDHAM HOTEL GROUP, LLC; SUPER 8 WORLDWIDE, INC., SHRI HARI INVESTMENTS LLC D/B/A TRAVELODGE & RV PARK; and INDEPENDENCE LODGING COMPANY D/B/A SUPER 8, | |
| Defendants. | JURY TRIAL DEMANDED |

## PLAINTIFF'S ORIGINAL COMPLAINT

Jane Doe (C.M.B.), Plaintiff in the above-styled and numbered cause, files this Original Complaint against Wyndham Hotels & Resorts, Inc., Wyndham Hotel Group, LLC, Super 8 Worldwide, Inc., Shri Hari Investments LLC d/b/a Travelodge & RV Park, and Independence Lodging Company d/b/a Super 8 as Defendants, and would respectfully show the Court and jury as follows:

## SUMMARY

1. Jane Doe (C.M.B.) files this civil lawsuit seeking compensation for the harm she suffered because of the sex trafficking she endured in hotels owned, operated, maintained, and controlled by Defendants and their agents and employees.

2. Sex trafficking is the recruitment, harboring, transportation, provision, obtaining, patronizing, or soliciting of a person for the purposes of causing the person to engage in a commercial sex act either (1) before the person turns 18 years old; or (2) through force, fraud, or

1

coercion.[1] Traffickers or 'pimps' use threats, violence, manipulation, lies, debt bondage, and other forms of coercion to compel adults and children to engage in commercial sex acts against their will.

3. Some victims are brought into trafficking through abduction or use of physical violence, while many other trafficking relationships begin with a false promise of a romantic relationship or financial security.[2] Traffickers often prey on individuals with vulnerabilities that make them more susceptible to coercion and control.[3]

4. Traffickers then use a variety of techniques to maintain control over their victims. Some traffickers use physical violence and overt threats to control their victims, while others use more subtle forms of fraud and coercion.[4] Many traffickers use techniques to undermine victims' ability to think and act independently through repetitive infliction of psychological trauma. These techniques can include high levels of control, exposure to chronic stress and threat, isolation, provocation of fear, and the creation of a sense of helplessness in victims.[5]

5. Sex trafficking has become a public health crisis that has reached epidemic proportions in the United States. It is now widely recognized, including by Congress and many state legislatures, that combating sex trafficking requires more than just criminal penalties for pimps and sex buyers.

6. Since 2003, federal law, through the Trafficking Victims Protection Reauthorization Act ("TVPRA"), 18 U.S.C. §1581, et seq, has provided victims of sex trafficking a civil remedy against perpetrators of criminal sex trafficking.

---

[1] 18 U.S.C. §1591; 22 U.S.C. § 7102.
[2] The National Prevention Toolkit, Sex Trafficking, https://nationaltoolkit.csw.fsu.edu/leo/part-2/sex-trafficking
[3] Polaris Project, Sex Trafficking: The Basics, https://polarisproject.org/understanding-human-trafficking/
[4] The National Prevention Toolkit, Sex Trafficking, https://nationaltoolkit.csw.fsu.edu/leo/part-2/sex-trafficking
[5] Elizabeth Hopper, Ph.D. & José Hidalgo, M.D., *Invisible Chains: Psychological Coercion of Human Trafficking Victims*, 1 Intercultural Hum. Rts. L. Rev. 185, 191 (2006).

7.    In 2008, Congress intentionally expanded the scope of the TVPRA to reach those who—while not criminally liable under the TVPRA—financially benefit from participation in a venture that they know or *should know* engages in criminal sex trafficking.

8.    Jane Doe (C.M.B.) alleges that Defendants derived financial benefit from facilitating sex trafficking by providing venues where traffickers could exploit victims, including Jane Doe (C.M.B.), with minimal risk of detection or interruption. Jane Doe (C.M.B.) further alleges that Defendants enabled traffickers, including her own trafficker, despite obvious and apparent signs of sex trafficking in these hotels. Defendants were, therefore, knowingly receiving a benefit from participation in a venture that Defendants knew or should have known was engaged in sex trafficking.

9.    Defendants had the opportunity to prevent the severe and permanent harm that Jane Doe (C.M.B.) experienced as the result of continuous trafficking. Defendants failed to do so. Instead, Defendants recklessly and/or negligently facilitated her sex trafficking. Accordingly, Jane Doe (C.M.B.) files this lawsuit.

## **PARTIES**

10.    Plaintiff, Jane Doe (C.M.B.), is a resident of Missouri. She may be contacted through her lead counsel, whose information is contained below.

11.    Jane Doe (C.M.B.) is a victim of sex trafficking under 18 U.S.C. §1591(a) because she was provided for the purpose of being caused, through force, fraud, or coercion, to commit a commercial sex act.

12.    The trafficking of Jane Doe (C.M.B.) occurred in or affected interstate commerce.

13.    Given the nature of the allegations in this lawsuit, there is a collective and compelling interest in not publicly revealing the identity of Jane Doe (C.M.B.).

3

14. Defendant Wyndham Hotels & Resorts, Inc. is a for-profit Delaware corporation with its principal place of business in Parsippany, New Jersey. Defendant may be served through its registered agent for service, Corporate Creations Network Inc. at 1521 Concord Pike, Suite 201, Wilmington, Delaware 19803.

15. Defendant Wyndham Hotel Group, LLC is a for-profit Delaware corporation with its principal place of business in Parsippany, New Jersey. Defendant may be served through its registered agent for service, Corporate Creations Network Inc. at 1521 Concord Pike, Suite 201, Wilmington, Delaware 19803.

16. Defendant Super 8 Worldwide, Inc. is a for-profit Delaware company with its principal place of business in Parsippany, New Jersey. Defendant may be served through its registered agent for service, Corporate Creations Network Inc. at 1521 Concord Pike, Suite 201, Wilmington, Delaware 19803.

17. Defendants Wyndham Hotels & Resorts, Inc. Wyndham Hotel Group, LLC, and Super 8 Worldwide, Inc. will be referred to collectively as "Franchisors" or "Wyndham Defendants." At all relevant times, the Wyndham Defendants were the franchisors for the Travelodge hotel located at 504 N Prairie View Rd., Platte City, Missouri 64079 and the Super 8 hotel located at 4032 S. Lynn Court Dr., Independence, Missouri 64055.

18. Defendant Shri Hari Investments LLC d/b/a Travelodge & RV Park ("Shri Hari") is a for profit limited liability company with its principal place of business in Missouri. Defendant may be served through its registered agent for service, Patricia A. Crooks at 5608 N Antioch Rd, Gladstone, Missouri 64119. At all relevant times, Defendant Shri Hari owned, operated, controlled, and managed the Travelodge by Wyndham Airport Platte City hotel located at 504 N Prairie View Rd., Platte City, Missouri 64079.

4

19. Defendant Independence Lodging Company d/b/a Super 8 ("Independence Lodging") is a for profit business with its principal place of business in Kansas. Defendant may be served through its registered agent for service, Aaron Cook at 4016 S Lynn Ct Dr, Independence, Missouri 64055. At all relevant times, Defendant Independence Lodging owned, operated, controlled, and managed the Super 8 hotel located at 4032 S. Lynn Court Dr., Independence, Missouri 64055.

20. Defendants Shri Hari and Independence Lodging will be collectively referred to as "Franchisees" or "Franchisee Defendants."

21. Wyndham Defendants and Franchisee Defendants will be referred to collectively as "Defendants."

**JURISDICTION AND VENUE**

22. This Court has jurisdiction over this lawsuit pursuant to 28 U.S.C. § 1331 because this action involves a federal question under the TVPRA.

23. Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because one or more Defendants reside in this district.

24. All Wyndham Defendants have the same principal place of business, which is in Parsippany, New Jersey, within the District of New Jersey. Therefore, each of the Wyndham Defendants is a resident of the District of New Jersey for the purpose of § 1391(b)(1).

25. Under 28 U.S.C. § 1391(c)(2), Franchisees are residents of New Jersey for the purpose of § 1391(b)(1) because the Court has personal jurisdiction over each of the Franchisees.

26. Under § 1391(d), Franchisees are residents of New Jersey for the purpose of § 1391(b)(1) because, if the District of New Jersey was a separate state, Franchisees' contacts with the district would be sufficient to subject them to personal jurisdiction.

5

27.     Plaintiff's claims against Franchisees arise out of Franchisees' contacts with New Jersey through Franchisees' relationship with the Wyndham Defendants, who have their principal place of business in the District of New Jersey. Franchisees' participation in a venture with the Wyndham Defendants operating the subject hotels occurred, in substantial part, in New Jersey because upon information and belief:

a.  Franchisees actively sought out a franchising relationship by contacting the Wyndham Defendants in New Jersey;

b.  Franchisees acknowledged that the negotiation, execution, and acceptance of the franchising agreements occurred in the District of New Jersey;

c.  Franchisees each agreed that their ongoing performance of the franchising agreements would take place, in part, in the District of New Jersey;

d.  The franchising agreements had a choice of law provision selecting the law of New Jersey as the governing law;

e.  The franchising agreements required Franchisees to report information to the Wyndham Defendants in New Jersey, including information about all incidents involving safety, security, public relations, or serious injuries to persons or property that occur at, or involve, the subject hotels, including those involving sex trafficking victims like Jane Doe (C.M.B.);

f.  Franchisees agreed to submit all notices required under the franchising agreements to the Wyndham Defendants in the District of New Jersey;

g.  Franchisees were required to attend training and meetings in New Jersey;

h.  The Wyndham Defendants dictated policies related to safety, security, human trafficking, employee training and Franchisees' responses, as well as other subjects from their principal place of business in the District of New Jersey;

i.  Franchisees had an ongoing obligation to participate in centralized programs operated by the Wyndham Defendants from their principal place of business in the District of New Jersey;

j.  Franchisees were required to purchase insurance on behalf of one or more New Jersey entities (the Wyndham Defendants);

k.  Reservation information for rooms at the subject hotels passed through a system operated and managed by the Wyndham Defendants from their principal place of business in New Jersey;

6

l.  Payment information for rooms at the subject hotels passed through a system operated and managed by the Wyndham Defendants in New Jersey;

m.  The benefits that Franchisees received from room rentals were governed by the New Jersey franchising agreements;

n.  Franchisees agreed to make all payments due under the franchising agreements at the Wyndham Defendants' principal place of business in the District of New Jersey;

o.  Franchisees' operations of the subject hotels were controlled and/or influenced by many policies set and enforced by the Wyndham Defendants from their principal place of business in Parsippany, New Jersey; and

p.  Franchisees signed a software licensing agreement with the Wyndham Defendants for the property management software the Wyndham Defendants required Franchisees to use when operating the subject hotels, including, but not limited to, when booking rooms at the hotels and processing payments for those rooms. Franchisees agreed to file any lawsuit arising from the licensing agreement in the Eastern District of New Jersey and waived personal jurisdiction and venue objections.

28.  Franchisee Defendants were Wyndham corporate affiliates who participated in a joint venture with the Wyndham Defendants centered in the District of New Jersey as described above, **and** parties to franchising agreements and management agreements with the Wyndham Defendants, thereby operating the subject hotels in substantial part, in New Jersey, as described above.

29.  Upon information and belief, Franchisees also contractually consented to jurisdiction in the District of New Jersey.

## STATEMENT OF FACTS

**I.   Jane Doe (C.M.B.) is a Survivor of Unlawful Sex Trafficking at a Hotel Owned, Operated, Managed, and Controlled by Defendants.**

30.  Jane Doe (C.M.B.)'s trafficker used drugs, emotional manipulation, and violence to force Jane Doe (C.M.B.) to engage in commercial sex acts from 2013 through December 21, 2015. Jane Doe (C.M.B.)'s trafficker kept all the money for his own financial benefit, and the situation she found herself in left Jane Doe (C.M.B.) fearing for her life.

7

31.     At various times between June 1, 2015 through December 21, 2015, Jane Doe (C.M.B.) was continuously and unlawfully trafficked at the Travelodge Travelodge by Wyndham Airport Platte City hotel located at 504 N Prairie View Rd., Platte City, Missouri 64079 ("Subject Travelodge"). Jane Doe (C.M.B.) was trafficked through force, fraud, and coercion by her trafficker and was required to engage in numerous commercial sex acts for his financial benefit at the Subject Travelodge.

32.     At various times between June 1, 2015 through December 21, 2015, Jane Doe (C.M.B.) was continuously and unlawfully trafficked at the Super 8 hotel located at 4016 S Lynn Ct Dr, Independence, Missouri 64055 ("Subject Super 8"). Jane Doe (C.M.B.) was trafficked through force, fraud, and coercion by her trafficker and was required to engage in numerous commercial sex acts for his financial benefit at the Subject Super 8.

33.     The Subject Travelodge and Subject Super 8 will be referred to collectively as the "Subject Hotels."

34.     Between June 1, 2015 through December 21, 2015, Jane Doe (C.M.B.) was trafficked countless times at the Subject Hotels.

35.     Jane Doe (C.M.B.)'s sexual exploitation repeatedly occurred in rooms of the Subject Hotels and was facilitated by the Wyndham Defendants and Franchisee Defendants. She was harbored, maintained, provided, and solicited, causing her to engage in commercial sex at the Subject Hotels.

36.     Jane Doe (C.M.B.) did not want to engage in commercial sex acts but felt as if she had no choice but to comply with her trafficker's demands.

37.     Jane Doe (C.M.B.) was not allowed to keep any of the money she made.

8

38. There were obvious signs that Jane Doe (C.M.B.) was being trafficked at the Subject Hotels such that the Wyndham Defendants and Franchisee Defendants knew or, through the exercise of reasonable diligence should have known, that they were benefiting from a venture causing her sexual exploitation.

39. Some of the obvious signs of Jane Doe (C.M.B.)'s trafficking at the Subject Hotels included the fact that the hotel rooms she stayed in were paid for with a prepaid card and the rooms were extended each day of the stay as opposed to paying for the entire stay up front, she had few or no personal items despite staying multiple days at a time, the do not disturb sign was always on her doors for the duration of the time she was in the rooms, housekeeping was not allowed to enter her rooms even though fresh towels and sheets were constantly requested, at least 5 different men who were not hotel guests visited her rooms daily and would stay no longer than 10-20 minutes at a time, her trafficker would loiter in the hallways, lobbies, and parking lots of the Subject Hotels when Jane Doe (C.M.B.) was with a john, her trafficker could not control his temper and complaints were often made about yelling and arguing coming from the rooms Jane Doe (C.M.B.) occupied, and Jane Doe (C.M.B.)'s trafficker did not have any form of ID.

40. During Jane Doe (C.M.B.)'s trafficking period, there were two types of Wyndham properties: corporate properties operated by corporate affiliates and franchised properties owned by third-party franchisees and operated in conjunction with Wyndham affiliates and as agents of Wyndham affiliates.

41. At all relevant times, the Subject Hotels were hotels branded by the Wyndham Defendants.

42. At all relevant times, Franchisee Defendants owned, operated, and managed the Subject Hotels and employed the staff at the Subject Hotels through the franchising system of the

9

Wyndham Defendants. Specifically, Shree Hari owned, operated, and managed the Subject Travelodge and employed the staff at the Subject Travelodge through the franchising system of the Wyndham Defendants, and Independence Lodging owned, operated, and managed the Subject Super 8 and employed the staff at the Subject Super 8 through the franchising system of the Wyndham Defendants.

43. At all relevant times, the Wyndham Defendants were directly involved in the relevant operations of the Subject Hotels and exercised systemic control over Franchisee Defendants with respect to operation of the Subject Hotels such that Franchisee Defendants were the Wyndham Defendants' actual agents for operation of the Subject Hotels. The Wyndham Defendants also retained control over aspects of the operations of the Subject Hotels directly related to the claims of Jane Doe (C.M.B.). Further, the Wyndham Defendants together with Franchisee Defendants, acted as the joint employer for the staff of the Subject Hotels.

44. The trafficker of Jane Doe (C.M.B.) and other sex traffickers frequently used the Subject Hotels for sex trafficking. There were obvious signs that Jane Doe (C.M.B.) was being trafficked at the Subject Hotels such that the Wyndham Defendants and Franchisee Defendants knew or, through the exercise of reasonable diligence should have known, that they were participating in a venture causing her sexual exploitation.

## II. The Hotel Industry's Role in Sex Trafficking and Defendants' Knowledge of the Problem.

45. The widely known and pervasive relationship between sex trafficking and the hotel industry necessarily shapes what Defendants knew or should have known regarding the trafficking of Jane Doe (C.M.B.) at the Subject Hotels.

10

46.     Today, sex slavery is pervasive in the United States, and hotels are the primary place where it happens.[6] For years, sex traffickers have been able to reap enormous profits with "little risk when attempting to operate within hotels."[7] In 2014, 92 percent of calls to the Human Trafficking Hotline involved reports of sex trafficking taking place at hotels.[8] Hotels have been found to account for over 90 percent of places where commercial exploitation of children happens most often.[9]

47.     Because of this link between hotels and sex trafficking, government agencies and non-profits have devoted significant efforts to educating the hotel industry, including Defendants, on best practices for identifying and responding to sex trafficking.[10]

48.     Multiple agencies and organizations who actively combat sex trafficking, including the United States Department of Homeland Security, the National Center for Missing and Exploited Children, the Polaris Project, the Texas Attorney General, Love 146, and EPCAT, among others, have established recommended policies and procedures for recognizing the signs of sex trafficking.[11]

---

[6] "This is not only a dominant issue, it's an epidemic issue." *See* Jaclyn Galucci, Human Trafficking is an Epidemic in the U.S. It's Also Big Business, Fortune, April 2019, at https://fortune.com/2019/04/14/human-sex-trafficking-usslavery/ citing Cindy McCain, who chairs the McCain Institute's Human Trafficking Advisory Council. "It's also something that is hiding in plain sight. It's everywhere—it's absolutely everywhere." *Id.*

[7] *See* Human Trafficking in the Hotel Industry, Polaris Project, February 10, 2016, at https://polarisproject.org/blog/2016/02/human-trafficking-in-the-hotel-industry/.

[8] Michele Sarkisian, *Adopting the Code: Human Trafficking and the Hospitality Industry*, CORNELL HOSPITALITY REPORT, 15(15), 3-10 (2015), available at: https://humantraffickingsearch.org/wp-content/uploads/2019/05/Adoptingthecode.report.cornell.pdf

[9] Erika R. George & Scarlet R. Smith, *In Good Company: How Corporate Social Responsibility Can Protect Rights and Aid Efforts to End Child Sex Trafficking in Modern Slavery*, 46 N.Y.U. J. INT'L L. & POL. 55, 92 (2013).

[10] *See, e.g.*, Department of Homeland Security, *Blue Campaign Toolkit*, available at: https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf; National Center for Missing & Exploited Children, *Child Sex Trafficking Overview*, available at: https://www.missingkids.org/content/dam/missingkids/pdfs/CST%20Identification%20Resource.pdf; Love 146, *Red Flags for Hotel and Motel Employees*, https://love146.org/wp-content/uploads/2017/04/Hospitality-Red-Flag-and-Reporting-Love146.pdf; Texas Attorney General, Human Trafficking Red Flags, available at: https://www2.texasattorneygeneral.gov/files/human_trafficking/human_trafficking_red_flags_handout.pdf .

[11] *See, e.g.*, Department of Homeland Security, *Blue Campaign Toolkit*, available at: https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf; National Center for Missing & Exploited Children, *Child Sex Trafficking Overview*, available at:

11

49.	Widely recognized signs of sex trafficking, which can be observed by hotel staff and which Defendants were made aware of, include but are not limited to:

a.	Individuals showing signs of fear, anxiety, tension, submission, and/or nervousness;

b.	Individuals showing signs of physical abuse, restraint, and/or confinement;

c.	Individuals exhibiting evidence of verbal threats, emotional abuse, and/or being treated in a demeaning way;

d.	Individuals showing signs of malnourishment, poor hygiene, fatigue, sleep deprivation, untreated illness, injuries, and/or unusual behavior;

e.	Individuals lacking freedom of movement or are constantly monitored;

f.	Individuals avoiding eye contact and interaction with others;

g.	Individuals having no control over or possession of money or ID;

h.	Individuals dressing inappropriately for their age or have lower quality clothing compared to others in their party;

i.	Individuals having few or no personal items—such as no luggage or other bags;

j.	Individuals appearing to be with a significantly older "boyfriend" or in the company of older males;

k.	A group of girls appearing to be traveling with an older female or male;

l.	A group of males or females with identical tattoos in similar locations. This may indicate "branding" by a trafficker;

m.	Drug abuse or frequent use of "party drugs" such as GHB, Rohypnol, Ketamine, MDMA (Ecstasy), Methamphetamines, Cocaine, and Marijuana;

n.	Possession of bulk sexual paraphernalia such as condoms or lubricant;

o.	Possession or use of multiple cell phones; and

p.	Possession or use of large amounts of cash or pre-paid cards.[12]

---

https://www.missingkids.org/content/dam/missingkids/pdfs/CST%20Identification%20Resource.pdf; Love 146, *red Flags for Hotel and Motel Employees*, https://love146.org/wp-content/uploads/2017/04/Hospitality-Red-Flag-and-Reporting-Love146.pdf; Texas Attorney General, Human Trafficking Red Flags, available at: https://www2.texasattorneygeneral.gov/files/human_trafficking/human_trafficking_red_flags_handout.pdf .
[12] *Id.*

50.     The signs of sex trafficking in a hotel environment follow well-established patterns and can easily be detected by appropriately trained staff. Tool kits specific to the hotel industry have been developed, which help hotel staff in every position identify and respond to signs of sex trafficking.[13] From check-in to check-out, there are indicators that traffickers and their victims routinely exhibit during their stay at a hotel.

51.     Defendants were aware or should have been aware of these signs of sex trafficking when operating, controlling, and managing the Subject Hotels, when enacting and enforcing policies and procedures applicable to those hotels, and when training, educating, and supervising the staff of those hotels.

52.     Given the prevalence of human trafficking in hotels and the abundance of information about how owners and hotel employees can identify and respond to this trafficking, it has become apparent that the decision of a hotel chain to continue generating revenue from traffickers *without* taking reasonable steps to identify and prevent trafficking in its hotels is a decision to financially benefit by facilitating unlawful sex trafficking.

53.     The relationship between a pimp and a prostitute is inherently coercive, and the United States Department of Justice and other agencies and organizations have recognized that most individuals involved in prostitution are subject to force, fraud, or coercion.[14] It is also well understood, and specifically trained in hotel safety training courses, that "prostitution," "sex trafficking," and "child sex trafficking" involve a single common denominator, the exchange of sex for money.

---

[13] Department of Homeland Security, *Blue Campaign Toolkit*,
https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf.
[14] *See, e.g., A National Overview of Prostitution and Sex Trafficking Demand Reduction Efforts, Final Report*,
https://www.ojp.gov/pdffiles1/nij/grants/238796.pdf; *Prostitution and Trafficking in Women: An Intimate Relationship*, https://www.ojp.gov/ncjrs/virtual-library/abstracts/prostitution-and-trafficking-women-intimate-relationship.

54.     The definition of sex trafficking in the TVPRA under 18 U.S.C. §1591(a)(1) incorporates the definition of commercial sex act. Defendants understood the practical and legal association between commercial sex and sex trafficking in a hotel environment. Thus, Defendants knew or should have known that signs of commercial sex (prostitution) activity in their hotels were in fact signs of sex trafficking.[15]

55.     All Defendants were aware or should have been aware of these signs of sex trafficking when operating, controlling, and managing their hotel properties, when enacting and enforcing policies and procedures applicable to those hotels, and when training, educating, and supervising the staff of those hotels.

56.     The most effective weapon against sexual exploitation and human trafficking is education and training.[16] As ECPAT concluded:

> The hospitality industry is in a unique position to identify and report human trafficking due to its perceived anonymity. Traffickers believe they can go unnoticed while exploiting victims across the globe in hotels— ranging from budget properties to luxury resorts. From check-in to check-out, there are a number of indicators victims and exploiters exhibit during the time they are on a hotel property.[17]

57.     This same conclusion is echoed by others who seek to eliminate or minimize sex trafficking in the hospitality industry, including the American Hotel Lodging Association: "Hotel employees who have undergone training are more aware of trafficking when it happens – and are more willing to report it – than those who have not been trained.[18] In reference to companies like

---

[15] *Id.*

[16] Polaris, *Recognizing Human Trafficking*, https://polarisproject.org/recognizing-human-trafficking/ (last visited April 13, 2023).

[17] ECPAT USA, *Training for Hotel Associates*, https://www.ecpatusa.org/hotel-training (last visited April 13, 2023). *See also* Caroline L. et al., *Sex Trafficking in the Tourism Industry*, J. Tourism Hospit. (2015), https://www.longdom.org/open-access/sex-trafficking-in-the-tourism-industry-2167-0269-1000166.pdf.

[18] AHLA, *Free Online Training*, https://www.ahla.com/issues/human-trafficking (last visited April 13, 2023).

14

Defendants, ECPAT observed: "If they do nothing to raise awareness or to prevent child trafficking, they risk becoming an indirect and unintentional conduit for the abuse that takes place."

58. Given the prevalence of human trafficking in hotels and the abundance of information about how owners, operators, and hotel employees can identify and respond to this trafficking, it has become apparent that the decision of a hotel chain to continue generating revenue from traffickers without taking necessary steps to identify and prevent trafficking in its hotels is a conscious decision to financially benefit by facilitating unlawful sex trafficking.

59. Defendants have failed, at all levels, to take appropriate action in response to their knowledge regarding human trafficking in their hotels. Instead, Defendants have continued financially benefiting from providing venues for the sexual exploitation of victims like Jane Doe (C.M.B.).

## III. Sex Trafficking Has Long Been Prevalent at Wyndham Properties.

60. Defendants' actual knowledge is *not* limited to a general awareness of the problem of sex trafficking in the hotel industry. Defendants have also known, or should have known, since well before Jane Doe (C.M.B.) was trafficked at the Subject Hotels, that sex trafficking is endemic at Wyndham properties, including the Subject Hotels.

### A. Sex Trafficking at Wyndham Properties was Well Known by All Defendants.

61. Upon information and belief, at all relevant times Wyndham has adopted a centralized approach to trafficking-related issues at all its branded properties. Wyndham's public statements confirm that it knew sex trafficking was a problem at its hotels and that it retained control over the response of its branded hotels to sex trafficking. Wyndham has recognized it has a "critical role in increasing awareness and prevention" of sex trafficking in its hotels.[19] It has

---

[19] https://hotelsmag.com/news/wyndham-implements-anti-prostitution-training/

15

publicly claimed to be taking steps to avoid facilitating sex trafficking in its hotels since at least 2011.[20] However, Wyndham has refused to publish reports to show its progress on the EPCAT goals to combat sex trafficking in hotels.[21]

62. Unfortunately, while Wyndham's statements reflect actual knowledge of the problem of sex trafficking, they reflect only a public relations strategy rather than a genuine commitment to stop facilitating trafficking. Emails among company executives reflect a hesitance to commit to meaningful anti-trafficking measures and a desire to avoid negative publicity without any significant burden.[22]

63. The problem of sex trafficking at Wyndham branded properties was sufficiently well known that, in 2011, there was a public petition with thousands of signatures to stop Wyndham hotels from supporting child sex exploitation at Wyndham properties. Although the Wyndham brand publicly committed to take steps to stop facilitating trafficking, this promise proved empty; the Wyndham brand has been named a "major contributor to sexual exploitation" and part of the "dirty dozen list" by the National Center on Sexual Exploitation.[23]

64. In the past twenty years, Wyndham-branded properties have been mentioned in at least two hundred criminal trafficking cases filed by the federal government.[24]

65. Information that has become public through news stories establishes the entrenched and pervasive nature of the Wyndham Defendants' role in providing a venue where sex trafficking

---

[20] https://hotelsmag.com/news/wyndham-implements-anti-prostitution-training/
[21] https://thecode.my.salesforce-sites.com/apex/MemberProfilenew?id=0019000000GxgPrAAJ&year=2023
[22] https://journalism.berkeley.edu/projects/should-hotel-chains-be-held-liable-for-human-trafficking/ ("Scott McLester, Wyndham's former general counsel and chief compliance officer, wrote in an e-mail to the company's then C.E.O., Stephen Holmes, 'Even though we have been hesitant to commit to everything the [EPCAT] Code was asking for, the issue is not going away and it's starting to impact commercial relationships.' McLester added that the organization's 'concern about being 'bullied' into signing the Code is outweighed by the relative harmlessness of the Code itself.'")
[23] https://endsexualexploitation.org/wyndham/
[24] https://journalism.berkeley.edu/projects/should-hotel-chains-be-held-liable-for-human-trafficking/

16

has continued unabated for years. Upon information and belief, the Wyndham Defendants monitored news stories and online reviews for indicia of criminal activity, including sex trafficking at their branded properties. Examples of news stories confirm the widespread presence of sex trafficking, prostitution, and related criminal activity at Wyndham branded hotels, including:

a. In 2010, a California man was arrested for trafficking a 16-year-old victim after being spotted by law enforcement with the minor at a Super 8 in California.[25]

b. In 2011, a man was sentenced for sex trafficking after he forced minor girls to engage in commercial sex for his financial benefit, including at a Super 8 Motel in Virginia.[26]

c. In 2011, a man was sentenced to life for child sex trafficking for requiring a minor to perform commercial sex services more than 50 times over a 14-day period at a Florida Super 8 Motel.[27]

d. In 2011, an MS-13 gang member was indicted for trafficking girls at a Super 8 Motel near Washington, D.C.[28]

e. In 2012, four were indicted after forcing a 24-year-old woman to engage in commercial sex at Ohio hotels, including a Super 8.[29]

f. In 2012, a man was arrested for attempting to entice a 15-year-old girl to engage in prostitution at a Super 8 Motel in Oklahoma.[30]

g. In 2013, two were arrested for trafficking a juvenile girl at an Illinois Super 8.[31]

h. In 2013, a man was arrested on human trafficking charges after he forced a woman to engage in commercial sex at hotels, including a Louisiana Super 8 Motel.[32]

---

[25] https://www.wired.com/2010/11/epps/
[26] Gang member sentenced for sex trafficking in Prince William, News & Messenger (Manassas, Virginia) (November 4, 2011) https://plus.lexis.com/api/permalink/562d85d9-e662-4e4f-8f7f-67b52fa537e8/?context=1530671
[27] https://www.fbi.gov/jacksonville/press-releases/2011/ja011011.htm
[28] https://www.thepublicdiscourse.com/2011/10/4034/
[29] https://www.10tv.com/article/news/crime/crime-tracker/four-indicted-first-human-trafficking-case-franklin-county/530-36f713e6-5488-4465-90c0-7eb99504a635
[30] Man faces new sex-trafficking charges, Tulsa World (Oklahoma ) (March 9, 2013) https://plus.lexis.com/api/permalink/a9062a1a-76b4-4811-89ab-5b0b3c877a88/?context=1530671
[31] https://www.channel3000.com/news/local-news/2-women-accused-of-human-trafficking-at-motel/article_98edf1d4-d231-5ea1-a6b9-e71c83f44750.html
[32] https://www.endslaverytn.org/news/tenn-man-booked-in-human-trafficking-newsarticle

i. A man was sentenced to 21 years in prison for sex trafficking his 16-year-old girlfriend starting in August 2013 at two hotels in Dallas, including a Super 8 Motel.[33]

j. In 2013, a man was arrested at a Super 8 in Rhode Island and charged with trafficking a 17-year-old girl at the motel.[34]

k. In 2013, a Super 8 motel in Massachusetts was searched and a man was charged with sex trafficking of a 17-year-old developmentally disabled girl after staying with her at that hotel.[35]

l. In 2013, two pled guilty to sex trafficking charges after forcing a child to engage in commercial sex at Super 8 Motel in Texas.[36]

m. In 2014, a sex trafficking task force arrested four in a Portland area sweep of a Super 8.[37]

n. In 2014, two were charged with trafficking a 13-year-old girl at a Minnesota Super 8.[38]

o. In 2014, a man was charged in connection with a Lansing, MI based sex trafficking ring involving four 15- to 18-year-old girls who would meet customers at the Super 8 in Lansing.[39]

p. In 2015, a Texas man was arrested and charged with human trafficking and second degree kidnapping after a woman said she was forced to perform sexual acts and was being held against her will at a Baton Rouge Super 8.[40]

q. In 2015, a LaGrange Kentucky Police Department's Special Investigation Unit discovered an alleged human trafficking and prostitution ring at a Super 8 motel involving a 16-year-old girl.[41]

r. In 2016, two men were charged with human trafficking-related offenses after officers responded to a Super 8 Motel in Frederick, Maryland.[42] One was later

---

[33] https://www.ice.gov/news/releases/dallas-gang-member-sentenced-21-years-federal-prison-child-sex-trafficking-conviction

[34] https://turnto10.com/archive/new-details-in-ardrey-sex-trafficing-investigation

[35] https://www.providencejournal.com/story/news/crime/2013/09/14/20130914-missouri-man-charged-with-sex-trafficking-in-mass-teens-disappearance-ece/35397014007/

[36] https://www.chron.com/news/article/two-plead-guilty-to-child-sex-trafficking-5000132.php

[37] https://www.centralmaine.com/2014/03/03/sex_trafficking_task_force_arrests_4_in_portland_area_prostitution_sting/

[38] https://www.grandforksherald.com/newsmd/moorhead-police-charge-two-with-sex-trafficking-13-year-old

[39] https://www.lansingstatejournal.com/story/news/local/2014/11/20/witnesses-face-lansing-man-charged-sex-trafficking-ring/70010754/

[40] https://www.wafb.com/story/29240032/texas-man-charged-with-human-trafficking-kidnapping-in-baton-rouge/

[41] https://www.lagrangenews.com/2015/10/03/alleged-human-trafficker-faces-charges/

[42] https://www.nbcwashington.com/news/local/two-charged-in-maryland-with-rape-human-trafficking-others/111815/

18

sentenced to 25 years in prison for second-degree rape and three counts of human trafficking.[43]

s.  In 2017, a man faced human trafficking charges after a sting at a Super 8 in Harrisburg, PA.[44]

t.  In 2017, a man was accused of running a prostitution ring involving Alvin ISD minors out of a Lake Jackson, TX Super 8.[45]

u.  In 2017, a sex trafficking operation was busted at a Super 8 in Lakeland, TN.[46]

v.  In 2017, a Texas statewide sex trafficking ring shut down multiple hotels, including a Super 8 in Fort Worth.[47]

w.  In 2018, authorities investigated a human trafficking case involving a 16 year old boy who was found at a Super 8 in Duson, LA.[48]

66.  Upon information and belief, the Wyndham Defendants monitored criminal activity occurring at their branded hotels and were aware of activity indicating commercial sex trafficking or related crimes occurring at those branded hotels, including the Subject Hotels.

67.  Reviews of Wyndham branded properties, which upon information and belief the Wyndham Defendants monitored regularly, also show both the pervasiveness of sex trafficking at their branded properties and the Wyndham Defendants' knowledge of same. For example:

a.  An August 2008 review of a Wyndham branded property in Arizona states: "Woke in middle of night (2:30am) with loud party on 2nd floor with bodies slamming into walls, and looked out window to see hooker and pimp making deal with another man in pickup in the parking lot."[49]

b.  A January 2010 review of a Wyndham branded property in Escondido, California states: "This is a hooker hangout, doors slaming at 3:00 AM, You will hear pimps on their cellphones outside in the middle of the night. Ladies arriving at 4:00 AM,

[43] https://www.fredericknewspost.com/news/crime_and_justice/courts/houston-man-sentenced-to-25-years-for-human-trafficking-in-frederick/article_81a5fa1e-598c-5431-b2f0-77dd49b1b545.html
[44] https://www.pennlive.com/news/2017/01/man_charged_with_human_traffic.html
[45] https://www.kgw.com/article/news/crime/man-accused-of-running-prostitution-ring-involving-alvin-isd-minors/285-424495364
[46] https://www.actionnews5.com/story/35657458/sex-trafficking-operation-busted-at-super-8-in-lakeland/
[47] https://tylerpaper.com/news/local/statewide-sex-trafficking-ring-shut-down-with-eight-arrests-including-some-tied-to-tyler/article_2db545e0-e48c-5c82-ace0-a7d27e746b96.html
[48] https://www.klfy.com/local/authorities-investigate-human-trafficking-case-involving-16-year-old-boy/
[49] https://www.tripadvisor.co/Hotel_Review-g60950-d74409-Reviews-Super_8_by_Wyndham_Tucson_Downtown_Convention_Center-Tucson_Arizona.html

Management MUST be aware this is going on and condone this. I expected John Walsh to show up with a film crew."[50]

c. A February 2010 review of a Wyndham branded property in Los Angeles, California states: "This place lacks security and there were drug dealers trying to push their products inside of the hotel. This place is Scary. The neighborhood was frightening and there were also prostitutes and homeless/addicts all over the place and renting rooms in the hotel. The desk guy looked at my friends attire (faux fur coat) and assumed he was a pimp and that we were prostitutes and seemed surprised that we had made reservations for more than one night. He kept giving us this strange smile... icky. This place left me with a bad feeling. If you want to stay here to save a few bucks my advice is to utilize the buddy system whenever you leave your room to visit the vending machines... after checking in for the night that is probably the only thing you will feel even moderately safe doing. eek. I can deal with scary hotels but this place is a disaster waiting to happen."[51]

d. A June 2010 review of a Wyndham branded property in Virginia states: "The location is in a very unsafe place. There were junkies and prostitutes using the premises of the hotel."[52]

e. A July 2010 review of a Wyndham branded property in Texas states: "After a night out parking lot full had to park under drive thur in front of hotel no other space. Number One reason to not stay here HOOKERS!!! walking the parking lot, walking the sidewalks and feeder road roads in front of Motel. All hours of the day."[53]

f. An October 2011 review of a Wyndham branded property in Tennessee states: "Don't stay here unless you want drugs or a prostitute....or both. There were drunks running up the halls all night and the maid offered to have sex with my husband for money. When he refused, she then offered to sell him pills."[54]

g. A February 2012 review of a Wyndham branded property in Florida states: "This hotel should not even be listed as a choice to stay in. Upon check, 3 rooms from me was a sexual battery crime scene. Prostitutes and drug deals were going on all over the property. The room was filthy, smelled horrible and I wouldn't even touch the bed! This hotel is a LIVE IN hotel for Prostitutes, drug dealers and gangs!!!!! DO NOT STAY HERE!!"[55]

---

[50] https://www.tripadvisor.com/Hotel_Review-g32358-d235407-i132418454-Super_8_Escondido-Escondido_California.html
[51] https://www.tripadvisor.com/Hotel_Review-g32655-d235134-Reviews-Super_8_by_Wyndham_Hollywood_La_Area-Los_Angeles_California.html
[52] https://www.expedia.com/Norfolk-Hotels-Super-8-By-Wyndham-NorfolkChesapeake-Bay.h7202.Hotel-Reviews
[53] https://www.tripadvisor.com/Hotel_Review-g30196-d109015-Reviews-Super_8_by_Wyndham_Austin_North_University_Area-Austin_Texas.html
[54] https://www.tripadvisor.com/Hotel_Review-g55138-d97967-Reviews-or165-Super_8_by_Wyndham_Knoxville_Downtown_Area-Knoxville_Tennessee.html
[55] https://www.tripadvisor.com/Hotel_Review-g34378-d113362-Reviews-Super_8_by_Wyndham_Lantana_West_Palm_Beach-Lantana_Florida.html

20

h. An April 2012 review of a Wyndham branded property in Virginia states: "Just beware, there are "escorts" who are constantly on the lookout for fresh meet. A pimp will knock on your door asking to use your cell to call his girlfriend. From then on, she will do the work."[56]

i. An April 2012 review of a Wyndham branded property in Texas states: "We have stayed in hotels all over the world and I have never had as terrible and frightening an experience as I had at this hotel. The place was crawling with prostitutes and seedy looking guys looking for prostitutes. We tried to stay here anyway, but the night manager started threatening us! In the end we had to call the police in order to safely leave. The police were very sympathetic, and apparently they have frequent problems with this hotel. Stay Away."[57]

j. An October 2012 review of a Wyndham branded property in Florida states: "the last time i stayed at this super 8, a hooker approached me in the parking lot and i informed you . this time there was a drug dealer in the next door room, cars coming and going all day & night a car would pull up and one person goes inside and 5 minutes later comes out. when i was checking out i told the desk clerk and the girl in the office says oh i know who that is. well if you knew about why was he still there. i will never stay there again, and i'm a loyal super 8 customer."[58]

k. A March 2013 review of a Wyndham branded property in Louisiana states: "There was a PROSTITUTE running her business from a room, with her pimp standing outside. She propositioned a co-worker as he was going to his room. Then in the middle of the night she and her clients were fighting very loudly over money and services issued!"[59]

l. A March 2013 review of a Wyndham branded property in Ohio states: "I've been solicited for drugs and by prostitutes here on several occassions. I told the hotel staff about it and they seem to turn a blind eye to the problem because these people are also buying rooms."[60]

m. A February 2013 review of a Wyndham branded 8 property in Minnesota states: "This hotel was disgusting. Homeless man passed out in lobby, possible prostitute hanging out in hallway with pimp, cigarette smell, ridiculous noise level throughout

---

[56] https://www.expedia.com/Manassas-Hotels-Super-8-By-Wyndham-Manassas.h12141.Hotel-Reviews
[57] https://www.tripadvisor.ca/Hotel_Review-g56003-d240483-Reviews-Super_8_by_Wyndham_Houston_Brookhollow_NW-Houston_Texas.html
[58] https://www.tripadvisor.com/Hotel_Review-g34378-d113362-Reviews-Super_8_by_Wyndham_Lantana_West_Palm_Beach-Lantana_Florida.html
[59] https://www.tripadvisor.ca/Hotel_Review-g40314-d120851-Reviews-FairBridge_Inn_Express_Metairie-Metairie_Louisiana.html
[60] https://www.tripadvisor.com/Hotel_Review-g50891-d226034-Reviews-Quality_Inn_Columbus_East-Reynoldsburg_Ohio.html

21

night, etc. Dirty shoes in microwave, empty beer cans in fridge. I cannot express enough how terrible this place really is."[61]

n.  An April 2013 review of a Wyndham branded property in Georgia states: "The hotel was filled with prostitutes and drug dealers and I was put in the back with my children which gave me no type of security. Super 8 needs to remove their name from this building."[62]

o.  A July 2013 review of a Wyndham branded property in California states: "Our first night we were greeted by undercover police busting the prostitutes using the spare rooms to turn tricks. Maids make extra income unlocking vacant rooms. I would not recommend this place for children.Or anyone for that fact."[63]

p.  An August 2013 review of a Wyndham branded property in Ohio states: "This hotel gives the Super 8 chain a bad reputation. The local restaurant management told us not to answer door due to prostitution issues."[64]

q.  An October 2013 review of a Wyndham branded property in Virginia states: "We ended up wedging a pole in the door for safety reasons. After dark the place turned into, I do NOT exaggerate, a open hoer house. At lease 4 pimps were doing business with a dozen or so girls there. If not for the safety reasons it was a life experience seeing that side of society. We were surprised at a chain like Super 8 condoning this activity. . . . The big thing was the blatant open prostitution that was condoned by your chain was despicable. The car music blaring and loud laughing and yelling was just like out of a rap video. Shame on you Super 8 for condoning this kind of activity just to fill a room."[65]

r.  A January 2014 review of a Wyndham branded property in Lake Worth, Florida states: "Cops arresting drug dealers upon my arrival. Prostitutes. Very unsafe… Wasted money at super 8. Should have slept under a bridge instead!"[66]

s.  A May 2014 review of a Wyndham branded property in Houston, Texas states: "However, we have been staying here for a while on business and have noticed lots of young white women (who look and dress like prostitutes) with black men who appear to be their pimps and I've seen them using two rooms using one for

---

[61] https://www.tripadvisor.com/Hotel_Review-g43493-d247863-Reviews-Super_8_by_Wyndham_St_Cloud-Saint_Cloud_Minnesota.html
[62] https://www.tripadvisor.com/Hotel_Review-g34856-d217054-Reviews-Super_8_by_Wyndham_Atlanta_Hartsfield_Jackson_Airport-College_Park_Georgia.html
[63] https://www.tripadvisor.com/Hotel_Review-g32655-d252254-Reviews-or50-Super_8_by_Wyndham_Canoga_Park-Los_Angeles_California.html
[64] https://www.tripadvisor.com/Hotel_Review-g50891-d226034-Reviews-Quality_Inn_Columbus_East-Reynoldsburg_Ohio.html
[65] https://www.tripadvisor.com/Hotel_Review-g58026-d110776-Reviews-or10-Super_8_by_Wyndham_Norfolk_Chesapeake_Bay-Norfolk_Virginia.html
[66] https://www.expedia.com/Lantana-Hotels-Super-8-By-Wyndham-Lantana-West-Palm-Beach.h855762.Hotel-Reviews

22

"business". Staff should really be more aware of what's really going on here. Also, have smelled pot being smoked everyday and it just seems to be ignored by the staff as well."[67]

t.  A June 2014 review of a Wyndham branded property in Austin, Texas states: "What can I say? The rooms are small, the furniture tore up, refrigerator not cold, sink and tub would back up with water, carpet sticky, lights with no lampshades, and hookers and pimps running around with the management's blessing."[68]

u.  A July 2014 review of a Wyndham branded property in Norfolk, Virginia states: "This place is in a cheaper end of town and the other guests looked like drunks and hookers hanging out in folding chairs on the balcony. Police were in the parking lot when we arrived."[69] Hotel management responded to this review on July 29, 2014.

v.  An October 2014 review of a Wyndham branded property in Denver, Colorado states: "The cleaning of the place was awful, prostitutes knocking on doors touting for business, the only reason i ended up staying there longer than a night was there was nowhere else. Will never go back again."[70]

w.  A December 2014 review of a Wyndham branded property in Augusta, Georgia states: "My room was right beside permanent residents. Had a prostitute come in my room while i was trying to load luggage in my vehicle...NEVER again will I stay here!"[71]

x.  A February 2015 review of a Wyndham branded property in Pompano Beach, Florida states: "I thought of something positive, you won't have to go looking for a hooker... they are already staying there."[72]

y.  A March 2015 review of a Wyndham branded property in Houston, Texas states: "Awfull. Drug dealers and prostitutes everywhere. Hotel staff just let it happen. Saw one of them with a crack pipe. I couldn't stay. Didn't even stick around long enough to check in. I called the police to report what I saw going on. Bad bad bad. Stay away from tjis one."[73]

---

[67] https://www.tripadvisor.com/Hotel_Review-g56003-d2531544-Reviews-Super_8_by_Wyndham_Houston_North_I_45-Houston_Texas.html
[68] https://www.tripadvisor.com/Hotel_Review-g30196-d142017-Reviews-Super_8_by_Wyndham_Austin_University_Downtown_Area-Austin_Texas.html
[69] https://www.tripadvisor.com/Hotel_Review-g58026-d110776-Reviews-or10-Super_8_by_Wyndham_Norfolk_Chesapeake_Bay-Norfolk_Virginia.html
[70] https://www.tripadvisor.ca/Hotel_Review-g33388-d82976-Reviews-Super_8_by_Wyndham_Denver_Stapleton-Denver_Colorado.html
[71] https://www.expedia.com/Augusta-Hotels-Super-8-By-Wyndham-Augusta.h10194.Hotel-Reviews
[72] https://www.expedia.com/Fort-Lauderdale-Hotels-Super-8-By-Wyndham-Pompano-Beach.h856303.Hotel-Reviews
[73] https://www.expedia.com/Houston-Hotels-Super-8-By-Wyndham-HoustonDtwnI-610.h892798.Hotel-Reviews

z.  An April 2015 review of a Wyndham branded property in Sacramento, California states: "Rooms were clean, but the smell of weed filled the hallways. Shady characters and possible prostitution activity were common throughout our stay. our Van door lock was broken, luckily we had nothing valuable inside. The front desk was friendly and courteous. I knew somethng was up when an armed security guard was present during check in."[74] Management responded to this review on April 12, 2015.

aa. A May 2015 review of a Wyndham branded property in Colarado Springs, Colorado states: "I'm not sure if it was the blood in the shower or the homeless man camped out in the stairwell that caps the awfulness of this place but maybe it was the prostitute's post-coital walk of shame on our last night that did it. Either way, this stay - without hyperbole - was the worst paid-lodging stay I've had in at least a decade…"[75]

bb. A July 2015 review of a Wyndham branded property in Raleigh, North Carolina states: "The two nights we were there were almost frightening. There were prostitutes visting guests, they were couples having fist fights both nights. Some man was on the property in broad daylight screaming all kinds of profanity. There was homeless guy hanging out in the parking lot and pretty sure he helped himself to coffee int he lobby and nobody said anything. I called and complained twice about the man screaming and the guys skating boarding on the walkway at 4:30 a.m. outside our door. The have no control over their property and will never stay there again!"[76]

cc. A September 2015 review of a Wyndham branded  property in Austin, Texas states: "I was propositioned twice by hookers who had rooms in the building and saw two drug deals go down in the parking lot. There are people going through the parking lot and picking up the dealer and then drop him off in a couple of minutes. The girls are also hanging outside and when a car pulls up they get in with the guy. They return in a few minutes and drop her off. The guys never get out."[77]

dd. A December 2015 review of Wyndham branded property in Fort Myers, Florida states: "This hotel is not in a good area nor is it a good place to stay. there were drugs being sold in the hotel parking lot and prostitutes were all around the hotel. Not a safe place to stay."[78]

ee. An April 2016 review of a Wyndham branded property in Austin, Texas states: "I'm going to be more blunt here than other reviewers. This is a whore house they even

---

[74] https://www.tripadvisor.com/Hotel_Review-g32999-d969149-Reviews-Super_8_by_Wyndham_Sacramento-Sacramento_California.html
[75] https://www.yelp.com/biz/super-8-by-wyndham-colo-sprs-garden-of-the-gods-colorado-springs
[76] https://www.tripadvisor.com/Hotel_Review-g49463-d94688-Reviews-Super_8_by_Wyndham_Raleigh-Raleigh_North_Carolina.html
[77] https://www.tripadvisor.com/Hotel_Review-g30196-d142017-Reviews-Super_8_by_Wyndham_Austin_University_Downtown_Area-Austin_Texas.html
[78] https://www.expedia.com/Fort-Myers-Hotels-Super-8-By-Wyndham-Fort-Myers.h49549.Hotel-Reviews

24

rent rooms by the hour, I found this out when attempting to do early check in and they have me the hourly rates. The bathroom is filthy, aged and poor quality simply painted cement with cracks and scratches. It is in a rough neighborhood so watch out for your car. Drugs and prostitutes. I even saw two guys lingering in line outside a room waiting for their turn. Lastly I was awoken at 6:15am by a man who was yelling at and, from the sounds of it, beating a dog. The female occupant of the room was begging him to stop which resulted in a slap."[79]

ff. An August 2016 review of a Wyndham branded property in North Hollywood, California states: "There was prostitution going on. Overall service suck, not worth at all the $140 that I paid."[80]

gg. A February 2017 review of a Wyndham branded property in New Orleans, Louisiana states: "Location was terrible which made Uber rides a fortune. What they don't tell you is that it's located in the 8th ward and full of prostitution and drugs."[81] Hotel management responded to this review on March 8, 2017.

hh. A May 2017 review of a Wyndham branded property in Minneapolis, Minnesota states: "Pictures are nothing like the hotel. Prostitutes, drugs, a building and parking lot full of very unsavory people is what you will get."[82]

ii. An August 2017 review of a Wyndham branded property in Lake Worth, Florida states: "If you can afford to stay someplace else then do it!!! Please do not bring your children here. Drugs, prostitution, police every day, ambulances in and out for overdoses. It's cheap for a reason people."[83] Hotel management responded to this review.

jj. A November 2017 review of a Wyndham branded property in Los Angeles, California states: "This place is disgusting, it smelled like urine in most of the hotel including our room and there were men coming in and out through the stairway. I think there might have been prostitution going on Wyndham should be ashamed at this property is part of their chain."[84] Hotel management responded to this review on November 27, 2017.

kk. An April 2018 review of a Wyndham branded property in Columbia, South Carolina states: "This place was horrible!! The clerk was hanging out with I guess extended stay guests in the front parking lot when we arrived. Two girls that looked like

[79] https://www.yelp.com/biz/super-8-by-wyndham-austin-university-downtown-area-austin
[80] https://www.expedia.com/Los-Angeles-Hotels-Super-8-By-Wyndham-North-Hollywood.h916715.Hotel-Reviews
[81] https://www.tripadvisor.com/Hotel_Review-g60864-d120826-Reviews-Super_8_by_Wyndham_New_Orleans-New_Orleans_Louisiana.html
[82] https://www.expedia.com/Minneapolis-St-Paul-Hotels-Super-8-By-Wyndham-Brooklyn-CenterMPLS.h124015.Hotel-Reviews
[83] https://www.expedia.com/Lantana-Hotels-Super-8-By-Wyndham-Lantana-West-Palm-Beach.h855762.Hotel-Reviews
[84] https://www.tripadvisor.com/Hotel_Review-g32655-d235134-Reviews-Super_8_by_Wyndham_Hollywood_La_Area-Los_Angeles_California.html

prostitutes were hanging around. Not such a safe looking place."[85] Hotel management responded to this review on April 25, 2018.

ll. A July 2018 review of a Wyndham branded property in Garland, Texas states: "Dont stay here unless you have ltc... there is drugs prostitution and all they do not clean nothing and the pool sucked I had condoms in the night stand... I would never put the Wyndham name on this crap hole hotel."[86] Hotel management responded to this review on July 17, 2018.

mm. A September 2018 review of a Wyndham branded property in Austin, Texas states: "Then we went to the room where we met a prostitute at the stairs. Went into our room which smelled very badly of mold. The air ventilation was terrible - way below standard. We went to bed, had trouble sleeping because we felt unsafe and uncomfortable. The night was full of noice with the sex activities, cars arriving and leaving, yelling and screaming in the parking lot and doors were slamming."[87]

nn. A December 2018 review of a Wyndham branded property in Oklahoma City, Oklahoma states: "very nasty rude staff unclean only waffles for breakfast. bathroom was nasty the toilet leaked.hookers were telling my son how much they charged do not stay here no matter how cheap. Thier were people yelling."[88] Hotel management responded to this review on December 22, 2018.

68. These articles and reviews are only representative examples. There are many similar articles about sex trafficking and other associated criminal activity at Wyndham hotels. Moreover, on information and belief, the Wyndham Defendants are aware of additional significant law enforcement activity related to trafficking at their hotels that was not reported in the media.

69. These articles, news stories, guest surveys, and online reviews show that the use of Wyndham hotels for sex trafficking was not isolated to one hotel property or a single geographic area. The common use of Wyndham hotels for sex trafficking became a nationwide problem that stemmed from decisions made at the corporate/franchisor level.

---

[85] https://www.tripadvisor.com/Hotel_Review-g54184-d226843-Reviews-Super_8_by_Wyndham_Columbia-Columbia_South_Carolina.html
[86] https://www.tripadvisor.com/Hotel_Review-g55884-d241642-Reviews-Super_8_by_Wyndham_Garland_North_Dallas_Area-Garland_Texas.html
[87] https://www.tripadvisor.com/Hotel_Review-g30196-d142017-Reviews-Super_8_by_Wyndham_Austin_University_Downtown_Area-Austin_Texas.html
[88] https://www.tripadvisor.com/Hotel_Review-g51514-d243913-Reviews-or20-Super_8_by_Wyndham_Midwest_City_OK-Midwest_City_Oklahoma.html

70. Both the Wyndham Defendants and Franchisee Defendants knew of the sex trafficking crisis prevalent in the hotel industry generally, as well as specifically at Wyndham branded hotels, including the Subject Hotels, and while they claim not to tolerate such activity, the evidence shows and will show at trial that sex trafficking continued at the Subject Hotels frequently and long after the trafficking of Jane Doe (C.M.B.).

71. This sampling of news stories, reviews, and other public information establishes that, at the time Jane Doe (C.M.B.) was trafficked at the Subject Hotels, the Wyndham Defendants knew or should have known, at least the following:

a. The use of their properties for sex trafficking was not limited to one location or geographic region but was a widespread problem;

b. Commercial sex work occurring at their properties involved trafficking and compelled prostitution;

c. Their hotel staff were not taking reasonable steps to identify, report, and respond to known or probable sex trafficking occurring at their hotel properties;

d. Their efforts, if any, to stop facilitating sex trafficking in their properties were not effective; and

e. They were, by their acts and omissions, facilitating sex trafficking at their properties by providing venues where that trafficking was occurring widely and without sufficient detection or deterrence.

72. Despite the continually mounting evidence that sex trafficking at Wyndham properties was ongoing and growing, the Wyndham Defendants did not change course. The Wyndham Defendants chose to continue earning revenue and profits from renting out space in their hotels, including the Subject Hotels, as a venue for trafficking.

**B. Sex Trafficking Was Prevalent and Obvious at the Subject Hotels.**

73. The Wyndham Defendants and Franchisee Defendants also knew or should have known that sex trafficking was prevalent at the Subject Hotels.

27

74.     The Wyndham Defendants and Franchisee Defendants knew that the Subject Hotels were in high-crime areas with a known history of reports of sex trafficking.

75.     Online reviews of the Subject Travelodge, which upon information and belief were monitored by the Wyndham Defendants and Shree Hari, establish the nature of the Subject Travelodge's role as a venue for criminal activity, including sex trafficking:

   a. A 2011 TripAdvisor review of the Subject Travelodge states: "We stayed one night... we found under the bed a used condom... told the manager and they said they would take care of it, we left for several hours came back, beds were made and condom, was still there..."[89]

   b. A 2014 Expedia review of the Subject Travelodge states: "The hotel was very noisy, lots of loud noises and "partiers" in and out of rooms all night."[90]

   c. A 2017 TripAdvisor review of the Subject Travelodge states: "drizzle of hot water out of shower, reported, nothing done. management would not fix. people drinking and partying in parking lot, lighting off fire works for an hour at 10:30 pm- management did nothing. refrigerator iced up with mold on it. prostitute in next room."[91]

   d. A 2017 Expedia review of the Subject Travelodge states: "And very unsavory characters roaming the parking lot all through the night while we were there. Wouldn't recommend this place to ANYONE else."[92]

   e. A 2018 Expedia review of the Subject Travelodge states: "Drug addict standing outside room asking if I wanted to have sex . A man passed out on the lower floor in chair. Filthy and scary. Room was filthy. We got our money back and left quickly."[93]

   f. A 2019 Expedia review of the Subject Travelodge states: "There was at least a 2 inch gap under the door, the room was dirty. The pillows smelled like they hadn't been washed in months. Didn't end up staying because I didn't feel safe and I went to check out about 1 hour after checking in and the manager didn't even seem

---

[89] https://www.tripadvisor.com/Hotel_Review-g44789-d266080-Reviews-Travelodge_by_Wyndham_Airport_Platte_City-Platte_City_Missouri.html
[90] https://www.expedia.com/Kansas-City-Hotels-Travelodge-By-Wyndham-Airport-Platte-City.h905415.Hotel-Information?pwaDialog=product-reviews
[91] https://www.tripadvisor.com/Hotel_Review-g44789-d266080-Reviews-Travelodge_by_Wyndham_Airport_Platte_City-Platte_City_Missouri.html
[92] https://www.expedia.com/Kansas-City-Hotels-Travelodge-By-Wyndham-Airport-Platte-City.h905415.Hotel-Information?pwaDialog=product-reviews
[93] https://www.expedia.com/Kansas-City-Hotels-Travelodge-By-Wyndham-Airport-Platte-City.h905415.Hotel-Information?pwaDialog=product-reviews

28

concerned. Said zero words, took my key and walked away. It looks like it should rent by the hour and the people loitering about reinforced that."[94]

    g. A 2021 Expedia review of the Subject Travelodge states: "We ended up leaving early as it appeared some sort of domestic dispute was going on next door and it felt unsafe."[95]

    h. A 2024 Expedia review of the Subject Travelodge states: "There was no housekeeping no clean towels for the five days I stayed this week. Not one knock on the door."[96]

    i. A 2025 Expedia review of the Subject Travelodge states: "When we arrived to the room we found a used condom between the tv stand and the wall. When we closed the door we realized we couldn't lock it and the eyehole had been removed from the door. My wife got barely any sleep concerned about door not locking and people right outside of our door … There were people milling around until the wee hours and the walls are paper thin."[97]

76. Further, the Subject Travelodge made the news in 2022 for arrests made at the property involving the exchange of sex for money.[98]

77. Online reviews of the Subject Super 8, which upon information and belief were monitored by the Wyndham Defendants and Independence Lodging, establish the nature of the Subject Super 8's role as a venue for criminal activity, including sex trafficking:

    a. A 2016 TripAdvisor review of the Subject Super 8 states: "Marijuana bags around the pool area near children. Television was defective only half picture. Uncooperative and rude customer service. Dishonest practices charged $100 in incidentals for no reason $385 total for two nights at a crappy Hotel. Railroaded by Hotel management. Worst experience in 20 years traveling doing this sport. Super 8 period will never see a dollar from my group and I."[99]

---

[94] https://www.expedia.com/Kansas-City-Hotels-Travelodge-By-Wyndham-Airport-Platte-City.h905415.Hotel-Information?pwaDialog=product-reviews
[95] https://www.expedia.com/Kansas-City-Hotels-Travelodge-By-Wyndham-Airport-Platte-City.h905415.Hotel-Information?pwaDialog=product-reviews
[96] https://www.expedia.com/Kansas-City-Hotels-Travelodge-By-Wyndham-Airport-Platte-City.h905415.Hotel-Information?pwaDialog=product-reviews
[97] https://www.expedia.com/Kansas-City-Hotels-Travelodge-By-Wyndham-Airport-Platte-City.h905415.Hotel-Information?pwaDialogNested=PropertyDetailsReviewsBreakdownDialog
[98] https://plattecountylandmark.com/2022/02/08/prostitution-alleged-at-local-motel/?utm_source=chatgpt.com
[99] https://www.tripadvisor.com/Hotel_Review-g60849-d90847-Reviews-Super_8_by_Wyndham_Independence_Kansas_City-Independence_Missouri.html

b. A 2019 Expedia review of the Subject Super 8 states: "THE ROOMS LOOKED LIKE WHAT I WOULD IMAGINE ROOMS RENTED BY THE HOUR WOULD LOOK LIKE. THE BED SPREAD WAS COVERED WITH STAINS. THE SHEETS HAD SOME KIND OF STAINS. THE HEALTH DEPT. NEEDS TO INSPECT THE PLACE WITH A BLACKLIGHT."[100]

c. A 2022 Expedia review of the Subject Super 8 states: "This place was roach infested. Took a group of youth for Silver Gloves Boxing tournament and roaches attacked the kids. 1st room 117 and they moved us to the 3rd floor and found roaches in the bed and running after the kids food when the sat down to eat. The water didn't work in the shower. The local police came to arrest someone for drug trafficking. The door to the room wouldn't work great inconvenience tracking down someone 3times to open it."[101]

d. A 2023 Google Maps review of the Subject Super 8 states: "If I could give zero stars, I would. We rented two rooms, one for my son and girlfriend who were on the ground floor backside of the hotel. Their room was broken into while we were at dinner and a show that night. They came through the window at ground level and stole everything. Police were contacted and report filed. Police told us this was a terrible neighborhood with lots of crime. Hotel management did nothing to help, we were told they are not liable. We left in the middle of the night with what was left and will never return."[102]

e. A 2023 Google Maps review of the Subject Super 8 states: "Absolutely the worse place. No elevators we had to carry everything up the stairs which isn't easy with a cooler and heavy suitcase. There was smell of Marijuana and smoke in the hallways. Cops in the parking lot every night we stayed, it was very sketchy the people coming and going. The breakfast was nothing special. We did not feel safe!!!"[103]

f. A 2024 Google Maps review of the Subject Super 8 states: "Tub wouldn't drain. Left over French Fries were left on the floor for us ( I guess in case we were hungry. Cob webs all over the ceiling. Looked like things haven't been dusted in quite some time. Oh, and the best was watching drug dealers doing there hand exchange in the parking lot. Breakfast was put away at 9am. Back door didn't

---

[100] https://www.expedia.com/Kansas-City-Hotels-Super-8-By-Wyndham-Independence-Kansas-City.h459612.Hotel-Information?pwaDialogNested=PropertyDetailsReviewsBreakdownDialog

[101] https://www.expedia.com/Kansas-City-Hotels-Super-8-By-Wyndham-Independence-Kansas-City.h459612.Hotel-Information?pwaDialogNested=PropertyDetailsReviewsBreakdownDialog

[102] https://www.google.com/maps/reviews/@39.0476015,-94.4168002,17z/data=!3m1!4b1!4m6!14m5!1m4!2m3!1sChZDSUhNMG9nS0VJQ0FnSURPcE5pelVREAE!2m1!1s0x0:0x521fe1432dbebced?entry=ttu&g_ep=EgoyMDI1MDUyNy4wIKXMDSoASAFQAw%3D%3D

[103] https://www.google.com/maps/reviews/@39.0476015,-94.4168002,17z/data=!3m1!4b1!4m6!14m5!1m4!2m3!1sChZDSUhNMG9nS0VJQ0FnSURPaGFMUlVnEAE!2m1!1s0x0:0x521fe1432dbebced?entry=ttu&g_ep=EgoyMDI1MDUyNy4wIKXMDSoASAFQAw%3D%3D

latch so any one could enter when ever. One of the worst hotels I've ever been in."[104]

g. A 2024 TripAdvisor review of the Subject Super 8 states: "Worst place I've stayed at in independence I thought days inn was bad but no this hotel is probably the worst and dirtiest I've stayed at crack heads and prostitution in and out all day and night even the workers especially the night shift manager they don't do their jobs properly and everytime I had went to the lobby it's always a hold on bc there on there personal device on the phone laughing and chatting it up it's disgusting this hotel and their attitudes"[105]

h. A 2024 Google Maps review of the Subject Super 8 states: "Aging property, shady location, no elevator. The staff do their best to keep the rooms clean and maintained. The hallways smell of weed, even though it's supposed to be a non smoking facility. Shady characters hanging in the parking lot in the evening. Will not stay here again!"[106]

78. Traffickers, including Jane Doe (C.M.B.)'s trafficker, repeatedly chose to use Wyndham properties, including the Subject Hotels, for their sex trafficking activity. As such, the Wyndham Defendants and Franchisee Defendants also knew or should have known about the pervasive sex trafficking at the Subject Hotels based on obvious indicators of this activity.

79. Upon information and belief and based on hotel reviews and records of law-enforcement calls, there were multiple trafficking victims exploited at the Subject Hotels prior to Jane Doe (C.M.B.)'s trafficking who exhibited "red flags" of trafficking that were observed by hotel staff and management, including paying with cash or prepaid cards, having high volumes of men who were not registered guests in and out of their rooms at unusual times, arriving with few possessions for extended stays, and other signs consistent with the "red flags" of trafficking identified above. Trafficking has a significant effect on its victims, and, upon information and

---

[104] https://www.google.com/maps/reviews/@39.0476015,-94.4168002,17z/data=!3m1!4b1!4m6!14m5!1m4!2m3!1sChdDSUhNMG9nS0VJQ0FnSUNaMk9UY2dBRRAB!2m1!1s0x0:0x521fe1432dbebced?entry=ttu&g_ep=EgoyMDI1MDUyNy4wIKXMDSoASAFQAw%3D%3D
[105] https://www.tripadvisor.com/ShowUserReviews-g60849-d90847-r968615079-Super_8_by_Wyndham_Independence_Kansas_City-Independence_Missouri.html
[106] https://www.google.com/maps/reviews/@39.0476015,-94.4168002,17z/data=!3m1!4b1!4m6!14m5!1m4!2m3!1sChZDSUhNMG9nS0VJQ0FnSUNkdFBmNlp3EAE!2m1!1s0x0:0x521fe1432dbebced?entry=ttu&g_ep=EgoyMDI1MDUyNy4wIKXMDSoASAFQAw%3D%3D

belief, there were obvious "red flags" of trafficking apparent from the appearance, demeanor, and restricted movements of these victims, as well as the nature of these victims' interactions with their traffickers and others, all of which provided notice that these victims were being subject to violence, coercion, control, and exploitation.

80. All knowledge from the staff at the Subject Hotels is imputed to the Wyndham Defendants. The Wyndham Defendants knew about this widespread and ongoing trafficking at the Subject Hotels, including the trafficking of Jane Doe (C.M.B.), through the direct observations of hotel staff, including management-level staff.

81. Upon information and belief, all Defendants knew or should have known about the widespread trafficking at the Subject Hotels, based on:

   a. The obligation of hotel staff and hotel management to report suspected criminal activity including sex trafficking to the Wyndham Defendants;

   b. Defendants' regular monitoring of online reviews;

   c. Defendants' collection and monitoring of customer surveys and complaints;

   d. Defendants' regular inspections of the hotel property;

   e. Information provided to Defendants by law enforcement; and

   f. Other sources of information available to Defendants.

82. Upon information and belief, under the Wyndham Defendants' protocols, hotel staff and management at the Subject Hotels were required to report numerous instances of suspected sex trafficking to the Wyndham Defendants prior to Jane Doe (C.M.B.)'s trafficking based on the numerous "red flags" exhibited by the victims who were exploited at the Subject Hotels.

**C. All Defendants Knew Jane Doe (C.M.B.) was Being Trafficked at the Subject Hotels Because of the Apparent and Obvious "Red Flags" of Sex Trafficking.**

32

83. During the period that Jane Doe (C.M.B.) was trafficked at the Subject Hotels, it was apparent she was the victim of sex trafficking.

84. Because it was known among the community of traffickers that staff at the Subject Hotels turned a blind eye to sex trafficking, Jane Doe (C.M.B.)'s trafficker made little or no effort to disguise his role or his actions.

85. At the Subject Travelodge, Jane Doe (C.M.B.) exhibited numerous obvious signs of trafficking, including:

    a. The hotel rooms in which she was trafficked were paid for online by Jane Doe (C.M.B.) with a prepaid card;

    b. The hotel rooms in which she was trafficked were extended each day by Jane Doe (C.M.B.) and were never paid for more than one night at a time;

    c. Jane Doe (C.M.B.)'s trafficker stayed in the same room as Jane Doe (C.M.B.) each time she stayed at the Subject Travelodge even though he never paid for rooms and did not possess an ID;

    d. Housekeeping and hotel staff were kept away by using the "Do Not Disturb" door hanger, which was used immediately and throughout each stay;

    e. Housekeeping staff was prevented from entering the room for regular cleaning, towel exchange, and other standard room services;

    f. Jane Doe (C.M.B.) constantly requested fresh towels and linens throughout the day and night;

    g. Jane Doe (C.M.B.)'s trafficker would linger around the hotel or in the parking lot while she was with a john;

    h. There was heavy foot traffic in and out of Jane Doe (C.M.B.)'s room involving men who were not hotel guests;

    i. An excessive amount of used condoms and condom wrappers would be found scattered throughout the room and in the trash can when Jane Doe (C.M.B.) would check out;

    j. Noise complaints from other guests were made to staff at the Subject Travelodge against Jane Doe (C.M.B.) due to constant yelling and screaming coming from her rooms;

33

k.  Each time a man who was not a hotel guest entered Jane Doe (C.M.B.)'s room, Jane Doe (C.M.B.)'s trafficker could be seen loitering around the property until the unregistered guest left, at which point Jane Doe (C.M.B.)'s trafficker would immediately return to the room;

l.  Jane Doe (C.M.B.) had approximately 5-10 johns come to her room each day she stayed at the Subject Travelodge. These individuals entered and left at random times and were only in Jane Doe (C.M.B.)'s room for approximately 10-30 minutes at a time; and

m.  Other obvious signs of trafficking consistent with the modus operandi of her traffickers and which included well known "red flags" for trafficking in a hotel.

86.  Upon information and belief, multiple employees at the Subject Travelodge, including management-level employees, observed and/or were made aware of these signs of trafficking while acting within the scope and course of their employment.

87.  At the Subject Super 8, Jane Doe (C.M.B.) exhibited numerous obvious signs of trafficking, including:

a.  The hotel rooms in which she was trafficked were paid for online by Jane Doe (C.M.B.) with a prepaid card;

b.  The hotel rooms in which she was trafficked were extended each day by Jane Doe (C.M.B.) and were never paid for more than one night at a time;

c.  Jane Doe (C.M.B.)'s trafficker stayed in the same room as Jane Doe (C.M.B.) each time she stayed at the Subject Super 8 even though he never paid for rooms and did not possess an ID;

d.  Housekeeping and hotel staff were kept away by using the "Do Not Disturb" door hanger, which was used immediately and throughout each stay;

e.  Staff and/or management at the Subject Super 8 told Jane Doe (C.M.B.) and her trafficker on multiple occasions that they needed to keep it down and that they were tired of the noise;

f.  Housekeeping staff was prevented from entering the room for regular cleaning, towel exchange, and other standard room services;

g.  Jane Doe (C.M.B.) constantly requested fresh towels and linens throughout the day and night;

h.  Jane Doe (C.M.B.)'s trafficker would linger around the hotel or in the parking lot while she was with a john;

34

i. There was heavy foot traffic in and out of Jane Doe (C.M.B.)'s room involving men who were not hotel guests;

j. An excessive amount of used condoms and condom wrappers would be found scattered throughout the room and in the trash can when Jane Doe (C.M.B.) would check out;

k. Noise complaints from other guests were made to staff at the Subject Super 8 against Jane Doe (C.M.B.) due to constant yelling from Jane Doe (C.M.B.)'s trafficker that could be heard through the walls;

l. Jane Doe (C.M.B.) and her trafficker were kicked out of the Subject Super 8 on one occasion due to a particularly loud argument they were having;

m. Each time a man who was not a hotel guest entered Jane Doe (C.M.B.)'s room, Jane Doe (C.M.B.)'s trafficker could be seen loitering around the property until the unregistered guest left, at which point Jane Doe (C.M.B.)'s trafficker would immediately return to the room;

n. Jane Doe (C.M.B.) had approximately 5-10 johns come to her room each day she stayed at the Subject Super 8. These individuals entered and left at random times and were only in Jane Doe (C.M.B.)'s room for approximately 10-30 minutes at a time; and

o. Other obvious signs of trafficking consistent with the modus operandi of her traffickers and which included well known "red flags" for trafficking in a hotel.

88. Upon information and belief, multiple employees at the Subject Super 8, including management-level employees, observed and/or were made aware of these signs of trafficking while acting within the scope and course of their employment.

89. Upon information and belief, Jane Doe (C.M.B.) was told by a manager at the Subject Super 8 that she couldn't keep doing what she was doing if they couldn't be more quiet.

90. As such, the Wyndham Defendants and Franchisee Defendants knew or should have known that Jane Doe (C.M.B.) was being trafficked at the Subject Hotels.

91. Given these obvious signs, the Wyndham Defendants and Franchisee Defendants knew or should have known about the trafficking of Jane Doe (C.M.B.) at the Subject Hotels based

35

on the policy or protocol that required hotel staff to report suspected criminal activity, including sex trafficking.

**IV. All Defendants Actively Facilitated Sex Trafficking at the Subject Hotels, Including Jane Doe (C.M.B.)'s Trafficking.**

92. The Wyndham Defendants and Franchisee Defendants had both actual and constructive knowledge of the trafficking of Jane Doe (C.M.B.) at the Subject Hotels because the trafficking was the direct result of their facilitating her trafficking at the Subject Hotels.

**A. Shree Hari Facilitated the Trafficking of Jane Doe (C.M.B.) at the Subject Travelodge.**

93. Shree Hari is responsible for the acts, omissions, and knowledge of all employees of the Subject Travelodge when operating the hotel because these acts and omissions were committed in the course and scope of employment, because Shree Hari ratified these acts and omissions, and because Shree Hari failed to exercise reasonable care with regard to the hiring, training, and supervision of these employees given the specific risks, known to Shree Hari, of sex trafficking occurring at Wyndham properties including the Subject Travelodge.

94. Despite having actual or constructive knowledge of widespread and ongoing sex trafficking at the Subject Travelodge, Shree Hari continued renting rooms to traffickers, including the rooms used to sexually exploit Jane Doe (C.M.B.).

95. Shree Hari knew or was willfully blind to the fact that Jane Doe (C.M.B.) was being trafficked and, despite this, benefited from continued association with her trafficker by providing him a venue in the form of hotel rooms and related services, to facilitate Jane Doe (C.M.B.)'s sexual exploitation.

96. Shree Hari facilitated Jane Doe (C.M.B.)'s trafficking at the Subject Travelodge through numerous acts and omissions, including:

36

a. Allowing traffickers to reserve rooms while maintaining relative anonymity and non-traceability;

b. Failing to check Jane Doe (C.M.B.)'s trafficker for any type of identification;

c. Failing to report suspected trafficking activity according to reasonable practices, industry standards, and/or applicable policies;

d. Despite seeing obvious signs of distress, failing to take any steps to inquire about the welfare of Jane Doe (C.M.B.);

e. Continuing to rent rooms to traffickers, including Jane Doe (C.M.B.)'s trafficker, despite the observed signs of trafficking;

f. Failing to take reasonable steps to hire, train and supervise staff to properly detect and respond to sex trafficking at the Subject Hotels;

g. Enabling traffickers to access ancillary services that supported trafficking activities, such as furnishing an unusually large number of sheets and towels to facilitate the commercial sex acts and providing disproportionate housekeeping services necessary to clean up the paraphernalia left after the transactions related to commercial sex; and

h. Providing the free Wi-Fi that Jane Doe (C.M.B.)'s trafficker used to advertise and solicit buyers to purchase commercial sex delivered by Jane Doe (C.M.B.) at the Subject Travelodge.

**B. Independence Lodging Faciliated the Trafficking of Jane Doe (C.M.B.) at the Subject Super 8.**

97. Independence Lodging is responsible for the acts, omissions, and knowledge of all employees of the Subject Super 8 when operating the hotel because these acts and omissions were committed in the course and scope of employment, because Independence Lodging ratified these acts and omissions, and because Independence Lodging failed to exercise reasonable care with regard to the hiring, training, and supervision of these employees given the specific risks, known to Independence Lodging, of sex trafficking occurring at Wyndham properties including the Subject Super 8.

98. Despite having actual or constructive knowledge of widespread and ongoing sex trafficking at the Subject Super 8, Independence Lodging continued renting rooms to traffickers, including the rooms used to sexually exploit Jane Doe (C.M.B.).

99. Independence Lodging knew or was willfully blind to the fact that Jane Doe (C.M.B.) was being trafficked and, despite this, benefited from continued association with her trafficker by providing him a venue in the form of hotel rooms and related services, to facilitate Jane Doe (C.M.B.)'s sexual exploitation.

100. Independence Lodging facilitated Jane Doe (C.M.B.)'s trafficking at the Subject Super 8 through numerous acts and omissions, including:

a. Allowing traffickers to reserve rooms while maintaining relative anonymity and non-traceability;

b. Failing to check Jane Doe (C.M.B.)'s trafficker for any type of identification

c. Failing to report suspected trafficking activity according to reasonable practices, industry standards, and/or applicable policies;

d. Despite seeing obvious signs of distress, failing to take any steps to inquire about the welfare of Jane Doe (C.M.B.);

e. Continuing to rent rooms to traffickers, including Jane Doe (C.M.B.)'s trafficker, despite the observed signs of trafficking;

f. Failing to take reasonable steps to hire, train and supervise staff to properly detect and respond to sex trafficking at the Subject Hotels;

g. Enabling traffickers to access ancillary services that supported trafficking activities, such as furnishing an unusually large number of sheets and towels to facilitate the commercial sex acts and providing disproportionate housekeeping services necessary to clean up the paraphernalia left after the transactions related to commercial sex; and

h. Providing the free Wi-Fi that Jane Doe (C.M.B.)'s trafficker used to advertise and solicit buyers to purchase commercial sex delivered by Jane Doe (C.M.B.) at the Subject Super 8.

**C. The Wyndham Defendants Facilitated the Trafficking of Jane Doe (C.M.B.) at the Subject Hotels.**

101. The Wyndham Defendants are responsible for the acts, omissions, and knowledge of all employees of the Subject Hotels when operating the hotels because these acts and omissions were committed in the course and scope of employment, because the Wyndham Defendants ratified these acts and omissions, and because the Wyndham Defendants failed to exercise reasonable care

38

with regard to the hiring, training, and supervision of these employees given the specific risks, known to the Wyndham Defendants, of sex trafficking occurring at Wyndham branded locations including the Subject Hotels.

102. Despite having actual or constructive knowledge of widespread and ongoing sex trafficking at the Subject Hotels, the Wyndham Defendants continued renting rooms to traffickers, including the rooms used to sexually exploit Jane Doe (C.M.B.).

103. The Wyndham Defendants knew or were willfully blind to the fact that Jane Doe (C.M.B.) was being trafficked and, despite this, benefited from continued association with her trafficker by providing him a venue in the form of hotel rooms and related services, to facilitate Jane Doe (C.M.B.)'s sexual exploitation.

104. The Wyndham Defendants also facilitated widespread trafficking at the Subject Hotels, including the trafficking of Jane Doe (C.M.B.), in ways including:

   a. Allowing inappropriate and inadequate practices for hiring, training, supervising, managing, and disciplining front-line staff regarding issues related to human trafficking;

   b. Inadequate and inadequately enforced sex trafficking notice and training for hotel staff;

   c. Choosing not to report known or suspected criminal activity including sex trafficking according to reasonable practices, industry standards, and/or applicable franchisor policies and procedures; and

   d. Implicitly encouraging the activities of traffickers by creating an environment where they did not need to incur the burden of taking significant steps to conceal their activities but, instead, could operate without concern for detection or interference by the hotel staff.

105. Upon information and belief, the Wyndham Defendants participated directly in aspects of the operation of the Subject Hotels that influenced whether and to what extent trafficking occurred at the hotels, including but not limited to the trafficking of Jane Doe (C.M.B.), as follows:

a. The Wyndham Defendants have publicly assumed responsibility and control over the human trafficking response of all Wyndham properties, including the Subject Hotels, including design and implementation of practices to prevent trafficking, safety and security procedures, employee and franchisee education, training, and response, partnership with external organizations, and advocacy;

b. The Wyndham Defendants retained control over when their branded hotels, including the Subject Hotels, would share information with law enforcement and when law enforcement would be contacted about suspected criminal activity in Wyndham branded hotels;

c. The Wyndham Defendants retained control over the response to trafficking by creating a reporting hotline for hotel staff and franchisees to report suspected human trafficking to the Wyndham Defendants. The Wyndham Defendants determined when issues should be escalated to the National Human Trafficking Hotline or law enforcement;

d. The Wyndham Defendants retained control over determining which hotels needed additional training or other resources based on a high risk of human trafficking and other related criminal activity;

e. The Wyndham Defendants expressly retained control to terminate hotel staff and/or a franchising agreement based on the response to human trafficking;

f. The Wyndham Defendants retained control, at the brand-wide level, over training on how to spot the signs of and help prevent human trafficking. The Wyndham Defendants determined whether the training is provided, when it is provided, the content of the training, how the training is delivered, who receives the training, and the consequences if someone does not participate in the training or fails to follow such training;

g. Although they delayed making any reasonable effort to do so, the Wyndham Defendants acknowledge that they retain control to adopt requirements for franchised hotels specifically designed to prevent human trafficking and other criminal activity;

h. The Wyndham Defendants maintain a Safety & Security Team and a Critical Incident Rapid Response Team that are charged with investigating and responding to potential criminal incidents at all Wyndham properties, including suspected trafficking incidents;

i. The Wyndham Defendants are responsible for adopting, enforcing, and monitoring policies and codes of conduct related to human trafficking at the Subject Hotels;

j. The Wyndham Defendants maintained control over all details of the terms under which franchised hotels, including the Subject Hotels, offered internet services to

40

customers, including dictating the software, hardware, and service provider to be used, setting all policies about use and restrictions on use, and actively collecting and monitoring guest internet usage data. The Wyndham Defendants dictated whether sites frequently used to solicit clients for sex trafficking victims would be accessible through the internet at the Subject Hotels;

k.  The Wyndham Defendants retained control over the setting, supervision, overseeing, and enforcement of detailed policies and protocol for housekeeping services at the Subject Hotels, including policies for how often rooms must be entered, how to respond to guest refusals of entry into rooms, and steps to monitor guest safety issues through housekeeping services; and

l.  The Wyndham Defendants collected, maintained, and analyzed detailed data regarding housekeeping services at the Subject Hotels, including trends that would reveal patterns consistent with human trafficking.

106.    The Wyndham Defendants directly participated in and retained day-to-day control over renting rooms at the Subject Hotels location by, among other things:

a.  The Wyndham Defendants controlled all details of the guest reservation, check-in, and payment processes through management and control over all systems used for those processes and adoption of detailed and specific policies governing the means and methods used for each of these processes;

b.  The Wyndham Defendants directly made reservations for rooms at the Subject Hotels and accepted payment for those rooms through a central reservation system that they controlled and operated. The Wyndham Defendants could reserve rooms and accept payments without requiring franchisee approval or involvement;

c.  The Wyndham Defendants established and maintained control over a brand-wide "do not rent" system. The Wyndham Defendants set all policies related to use of this system and dictated the day-to-day details of reservations at the Subject Hotels through detailed policies that it established regarding use of this "do not rent" system;

d.  The Wyndham Defendants controlled room rates, required discounts, mandatory fees, and rewards program;

e.  The Wyndham Defendants controlled and restricted the ability of Franchisees and staff to refuse or cancel a reservation;

f.  The Wyndham Defendants controlled and oversaw policies and procedures regarding check-in, payment, and identity verification procedures;

41

g. The Wyndham Defendants collected, retained, monitored, and analyzed detailed data about every guest who stayed at the Subject Hotels;

h. The Wyndham Defendants established detailed policies and protocol that dictated, step-by-step, everything that would happen from the time a guest arrived at the Subject Hotels until they entered their guest room. This included operational directives regarding payment methods, identification requirements, the number of guests that could be in each room and whether information needed to be collected for each guest, what questions hotel staff should and should not ask, and other matters related to check-in; and

i. The Wyndham Defendants required Franchisees to use Wyndham's property management system, which was owned, maintained, controlled, and operated by the Wyndham Defendants, for virtually all aspects of hotel operations regarding room reservations and payment.

107. Despite having actual or constructive knowledge of widespread and ongoing sex trafficking at the Subject Hotels, the Wyndham Defendants continued renting rooms to traffickers, including the rooms used to sexually exploit victims, including Jane Doe (C.M.B.).

108. Upon information and belief, despite having actual or constructive knowledge of the ongoing sex trafficking at the Subject Hotels, the Wyndham Defendants continued participating in a venture at these hotels, with Franchisee Defendants and hotel staff, in a way that they knew or should have known would lead to additional sex trafficking at the hotels, including but not limited to by the following:

a. The Wyndham Defendants adopted inappropriate and inadequate practices for selecting, training, supervising, managing, and disciplining Franchisees and hotel staff regarding issues related to human trafficking;

b. The Wyndham Defendants provided inadequate training on issues related to human trafficking and unreasonably delayed providing training;

c. The Wyndham Defendants adopted a safety and security budget and safety and security practices that were clearly insufficient considering the known problem of sex trafficking at Wyndham properties, including the Subject Hotels;

d. The Wyndham Defendants implicitly approved decisions by Franchisee Defendants and hotel staff not to report or respond to criminal activity including sex trafficking appropriately;

42

e. The Wyndham Defendants continued to use policies, protocols, and practices that had been shown to lead to widespread trafficking at the Subject Hotels;

f. The Wyndham Defendants attracted traffickers by affirmatively creating favorable venues where access was easy, risks of interference were low, and traceability was minimal;

g. Despite having specific knowledge of policies that would significantly reduce sex trafficking at their branded locations including the Subject Hotels, the Wyndham Defendants declined to implement policies that would likely have the effect of reducing their sex-trafficking related profits or that would require publicly acknowledging the ongoing problem of sex trafficking at their properties;

h. The Wyndham Defendants willfully delayed taking obvious and apparent steps to stop facilitating sex trafficking, which they had the ability and responsibility to take sooner;

i. The Wyndham Defendants allowed traffickers to reserve rooms using cash, which provided relative anonymity and non-traceability; and

j. The Wyndham Defendants provided traffickers with access to internet services in a manner that the Wyndham Defendants knew or should have known would be used to facilitate trafficking by promoting commercial sex services online.

109. If the Wyndham Defendants had exercised reasonable diligence when operating their properties and, in the areas where they retained control, the Wyndham Defendants would have prevented the Subject Hotels from being used to facilitate widespread and ongoing sex trafficking, including the trafficking of Jane Doe (C.M.B.). Instead, the Wyndham Defendants engaged in a course of conduct that affirmatively facilitated widespread and ongoing sex trafficking, including the trafficking of Jane Doe (C.M.B.).

## V.   Defendants' Ventures at the Subject Hotels.

110. The Wyndham Defendants generated substantial income from the Subject Hotels, receiving a share of the profits from room rentals collected at the hotel. The fees generated by the Wyndham Defendants were primarily based on gross room rentals; therefore, the Wyndham Defendants' profits increased with each room rental at the Subject Hotels, including each room

43

rented to a trafficker. Revenue generated from rooms rented at the Subject Hotels was distributed among the Wyndham Defendants, with each benefiting from each rental of a hotel room to a trafficker, including Jane Doe (C.M.B.)'s trafficker.

111. Franchisee Defendants profited from every room rented to a trafficker or for use in trafficking at the Subject Hotels, both from the room fee and from fees for other hotel services.

112. In ways described more fully above, the Wyndham Defendants and Franchisee Defendants knowingly received a financial benefit from participating in a venture in the form of a continuous business relationship and implicit understanding with the population of sex traffickers operating out of the Subject Hotels, including Jane Doe (C.M.B.)'s trafficker (hereinafter "**Venture 1**").

113. The Wyndham Defendants and Franchisee Defendants formed this continuous business relationship and implicit understanding with the traffickers at the Subject Hotels by continuing to rent rooms to be used for trafficking (including (C.M.B.)'s trafficking) after the Wyndham Defendants and Franchisee Defendants knew or should have known that the rooms were being used for unlawful trafficking.

114. This business relationship involved mutual pursuant of financial benefit: the traffickers were renting the hotel rooms to generate revenue from sex trafficking and the Wyndham Defendants and Franchisee Defendants were generating revenue by renting the hotel rooms.

115. This implicit understanding developed because sex traffickers, including Jane Doe (C.M.B.)'s trafficker, frequently used the Subject Hotels for their trafficking knowing that staff members would look the other way. This occurred because of the acts and omissions of the Wyndham Defendants and Franchisee Defendants that created a favorable environment for sex trafficking to flourish.

44

116.     Both the Wyndham Defendants and Franchisee Defendants participated in this venture by acting jointly to rent rooms to traffickers and to operate the hotel in a way that attracted business from traffickers and facilitated their trafficking activity. As further described above, Franchisee Defendants provided "boots on the ground" at the hotel, and the Wyndham Defendants played a primary role in renting rooms at the Subject Hotels and retained control over and was directly involved in aspects of hotel operations related to sex trafficking.

117.     The Wyndham Defendants and Franchisee Defendants participated in the venture by continually renting rooms to traffickers, including Jane Doe (C.M.B.)'s trafficker, after they knew or should have known that victims like Jane Doe (C.M.B.) were being subjected to unlawful trafficking. They also continued operating the Subject Hotels in a way that they knew or should have known would encourage traffickers to select the Subject Hotels as venues for their illegal activities.

118.     The Wyndham Defendants and Franchisee Defendants did not only provide these traffickers with a physical space (harboring) where they could imprison victims and sell them "johns" (providing), but they also provided these traffickers with the cover of a legitimate business as a venue where they could profit from sexual exploitation with a low risk of disruption. This was done pursuant to an implicit agreement with traffickers, which is evidenced by, among other things:

   a. The population of traffickers, including Jane Doe (C.M.B.)'s trafficker, were familiar to the staff at the Subject Hotels;

   b. These traffickers reduced their operating burden because they did not need to make significant efforts to conceal their activities from the staff at the Subject Hotels but, instead, freely made requests that would facilitate their trafficking activities without concern for detection or interference by the staff;

   c. Defendants allowed traffickers to take steps that would minimize their traceability to law enforcement, such as accepting cash payments and not requiring identification from appropriate parties, including Jane Doe (C.M.B.)'s trafficker; and

d.  Defendants provided additional services to traffickers (including Jane Doe (C.M.B.)'s trafficker), including but not limited to, internet access, excessive towels, and extra housekeeping services to clean the activities of the trafficking venture once the traffickers vacated the rooms.

119.  The criminal traffickers operating at the Subject Hotels as part of Venture 1 violated 18 U.S.C. §1591 as to victims including Jane Doe (C.M.B.).

120.  If the Wyndham Defendants and Franchisee Defendants had not continued participating in a venture that they knew or should have known engaged in violations of the TVPRA, they would not have received a benefit from Jane Doe (C.M.B.)'s trafficking at the Subject Hotels.

121.  In ways described more fully above, the Wyndham Defendants and Franchisee Defendants also knowingly received a financial benefit from participating in a commercial hotel-operating venture at the Subject Hotels (hereinafter "**Venture 2**").

122.  The Wyndham Defendants and Franchisee Defendants had a longstanding business relationship pursuant to which they jointly participated in operation of the Subject Hotels with a shared goal of maximizing revenue, including gross room revenue.

123.  The Wyndham Defendants and Franchisee Defendants, through their respective roles in hotel operations as described above, facilitated widespread sex trafficking at the Subject Hotels by continuing to operate the hotels in a way that they knew or should have known resulted in them benefiting from significant sex trafficking occurring on site at these hotels.

124.  Venture 2 was engaged in a violation of the TVPRA through the widespread sex trafficking at the Subject Hotels, which resulted in Jane Doe (C.M.B.) and other victims being harbored, maintained, and provided in the rooms of the Subject Hotels. Venture 2 also engaged in a violation of the TVPRA through the actions of Franchisee Defendants who violated the TVPRA

46

as perpetrators by harboring sex trafficking victims as defined by 18 U.S.C §1591(a)(1) and by participating in a criminal trafficking venture as defined by 18 U.S.C §1591(a) (2).

125. Despite their actual or constructive knowledge that Venture 2 was engaged in violations of 18 U.S.C. §§ 1591(a) and 1595(a), the Wyndham Defendants and Franchisee Defendants participated in the venture by continuing to operate the Subject Hotels in a way that they knew or should have known would lead to further violations of 18 U.S.C. §1591, including the trafficking of Jane Doe (C.M.B.). The Wyndham Defendants provided Franchisee Defendants with operational support, use of trademarks, marketing services, and other resources to operate the Subject Hotels in a way that they knew or should have known was engaging in violations of 18 U.S.C §1591(a).

## VI. Franchisee Defendants and the Staff at the Subject Hotels Acted as the Wyndham Defendants' Actual Agents.

126. The Wyndham Defendants are vicariously liable for the acts, omissions, and knowledge of Franchisee Defendants and the staff at the Subject Hotels, which are the Wyndham Defendants' actual agents or subagents.

127. The Wyndham Defendants subjected Franchisee Defendants to detailed standards and requirements regarding the operation of the Subject Hotels through the franchising agreements with each Franchisee Defendant, detailed written policies and manuals, and through other formal and informal protocols, directives, mandates, and expectations imposed by the Wyndham Defendants.

128. The Wyndham Defendants obscure the full extent of control they exercise over Franchisee Defendants by treating the manuals and certain policies as confidential and proprietary and prohibiting any public disclosure of those policies and manuals. Upon information and belief, the standards that the Wyndham Defendants imposed on Franchisee Defendants:

47

a.  Did not merely identify quality or outcome standards but instead specifically controlled the means, methods, and tools Franchisee Defendants used at the Subject Hotels;

b.  Covered virtually all aspects of hotel operations, including internal operating functions;

c.  Dictated the specific manner in which Franchisee Defendants and hotel staff must carry out most day-to-day functions at the Subject Hotels; and

d.  Significantly exceeded what was necessary for the Wyndham Defendants to protect their registered trademarks.

129.  In addition to the ways described above, upon information and belief, the Wyndham Defendants exercised and reserved the right to exercise systemic and pervasive control over Franchisee Defendants' day-to-day operation of the Subject Hotels, including the following ways:

a.  The Wyndham Defendants required Franchisee Defendants and management of the Subject Hotels to participate in mandatory training programs, both during onboarding and on an ongoing basis. This training covered all aspects of hotel operations, including aspects of hotel operations that go significantly beyond what would be necessary for the Wyndham Defendants to protect their registered trademarks;

b.  The Wyndham Defendants provided training for hotel management and select hotel staff on-site at the Subject Hotels and at locations selected by the Wyndham Defendants;

c.  The Wyndham Defendants required all hotel staff to participate in training they created through an online learning platform they controlled and maintained;

d.  The Wyndham Defendants controlled training provided by Franchisee Defendants to hotel staff by dictating the content of that training, providing required content for that training, and dictating the training methods used;

e.  The Wyndham Defendants retained sole discretion to determine whether all training had been completed satisfactorily;

f.  For certain products and services that Franchisee Defendants were required to purchase to operate the Subject Hotels, the Wyndham Defendants designated approved vendors and prohibited Franchisee Defendants from purchasing goods and services from anyone other than an approved vendor;

48

g. The Wyndham Defendants required Franchisee Defendants to sign a technology agreement governing the terms under which Franchisee Defendants must procure and use technical services and software while operating the Subject Hotels. Franchisee Defendants were required to install and use certain brands, types, makes, and/or models of hardware, software, peripheral equipment, and support services to perform internal operating functions at the Subject Hotels;

h. The Wyndham Defendants set required staffing levels for the Subject Hotels;

i. The Wyndham Defendants established detailed job descriptions for all positions at the Subject Hotels and drafted numerous, detailed policies that referenced these positions and dictated which positions must perform which tasks and how they must do so;

j. The Wyndham Defendants set requirements for the hiring process used by Franchisee Defendants and oversaw employee discipline processes and termination decisions;

k. The Wyndham Defendants provided benefits for employees of Franchisee Defendants;

l. The Wyndham Defendants required Franchisee Defendants to use a customer resource management program maintained and operated by the Wyndham Defendants;

m. The Wyndham Defendants controlled channels for guests to report complaints or provide feedback regarding the Subject Hotels and directly participated in the response and/or supervised the response to customer complaints or other feedback. The Wyndham Defendants retained the right to provide refunds or other compensation to guests and to require Franchisee Defendants to pay associated costs;

n. The Wyndham Defendants generated reports and analysis of guest complaints and online reviews for the Subject Hotels;

o. The Wyndham Defendants required Franchisee Defendants to use a Guest Relations Application owned, operated, and maintained by the Wyndham Defendants to manage all guest data and information. The Wyndham Defendants could use the backend of this system to analyze data and generate reports;

p. The Wyndham Defendants set detailed requirements for insurance that Franchisee Defendants must purchase and retained the right to purchase insurance for Franchisee Defendants and to bill Franchisee Defendants directly for that insurance if the Wyndham Defendants determined that Franchisee Defendants had not purchased adequate insurance;

49

q. The Wyndham Defendants regularly audited the books and records of Franchisee Defendants;

r. The Wyndham Defendants conducted frequent and unscheduled inspections of the Subject Hotels;

s. The Wyndham Defendants employed consultants or field agents to become involved in the day-to-day operations of the Subject Hotels;

t. The Wyndham Defendants retained the right to issue fines, require additional training, to impose and supervise implementation of detailed corrective action plans, and to take other steps up to and including termination of the franchising agreement if Franchisee Defendants violated any of the Wyndham Defendants' detailed rules, expectations, protocols, or policies, including those that governed day-to-day operations of the Subject Hotels;

u. The Wyndham Defendants controlled all marketing for the Subject Hotels and prohibited Franchisee Defendants from maintaining any online presence unless specifically reviewed and approved by the Wyndham Defendants;

v. The Wyndham Defendants imposed detailed recordkeeping and reporting requirements on Franchisee Defendants regarding virtually all aspects of hotel operations;

w. The Wyndham Defendants supervised and controlled day-to-day operations of the Subject Hotels through detailed information and extensive reports that they obtained through the property management system and other software systems they required Franchisee Defendants to use; and

x. The Wyndham Defendants retained the virtually unlimited right to revise policies or adopt new requirements for the day-to-day aspects of hotel operations at the Subject Hotels.

130. Under the TVPRA, Defendants are jointly and severally liable for all damages a jury awards to Jane Doe (C.M.B.) for past and future losses she suffered as a proximate result of her sexual exploitation and trafficking at the Subject Hotels.

50

<u>**CAUSES OF ACTION – SEX TRAFFICKING UNDER THE TVPRA**</u>

**I. Count 1: Perpetrator Liability Under 18 U.S.C § 1595(a) Based on Violation of 18 U.S.C § 1591(a) (Shree Hari and Independence Lodging).**

131. Jane Doe (C.M.B.) is a victim of sex trafficking within the meaning of 18 U.S.C § 1591 and § 1591(a) and is thus entitled to bring a civil action under 18 U.S.C §1595(a) against the "perpetrator" of any violation of the TVPRA.

132. Franchisee Defendants are perpetrators within the meaning of 18 U.S.C § 1595(a) because they:

    a. Violated 18 U.S.C §1591(a)(1) when, through the acts and omissions described throughout this Complaint, they harbored individuals (including Jane Doe (C.M.B.)) knowing or in reckless disregard of the fact that the victims would be caused, while a minor and/or through force, coercion, or fraud, to engage in commercial sex acts while at its respective hotel property; and

    b. Violated 18 U.S.C §1591(a)(2) when, through the acts and omissions described throughout this Complaint, they received financial benefit by knowingly assisting, supporting, or facilitating a venture that was engaged in violations under 18 U.S.C §1591(a)(1) at the Subject Hotels.

133. Violations of 18 U.S.C. § 1595(a) by Franchisee Defendants as "perpetrators" operated, jointly, with other unlawful acts and omissions alleged in this Complaint, to cause Jane Doe (C.M.B.) to suffer substantial physical and psychological injuries and other damages because of her trafficking and sexual exploitation at the Subject Hotels.

**II. Count 2: Beneficiary Liability under §1595(a) of the TVPRA (all Defendants).**

134. Jane Doe (C.M.B.) is a victim of sex trafficking within the meaning of 18 U.S.C §§ 1591 and 1595(a) and is thus entitled to bring a civil action under the "beneficiary" theory in 18 U.S.C §1595(a) against anyone who knowingly benefited from participation in a venture that the person knew or should have, with reasonable diligence, known was engaged in a violation of the TVPRA.

51

135.    All Defendants are liable as beneficiaries within the meaning of 18 U.S.C. § 1595(a) because, as further described above, each Defendant knowingly benefitted, by receiving additional revenue and other benefits, from its participation in a venture Defendants knew or should have known was engaged in a violation of the TVPRA.

136.    **Venture 1:** Through acts and omissions more fully described throughout this Complaint, each Defendant received a financial benefit from participating in a venture with sex traffickers, including Jane Doe (C.M.B.)'s trafficker. Each Defendant violated the TVPRA through its participation, as a beneficiary, in Venture 1 as follows:

   a.   Venture 1 resulted when Defendants developed and maintained a continuous business relationship and implicit understanding with sex traffickers at the Subject Hotels by renting them hotel rooms and providing them related services despite the fact that each Defendant knew or should have known these traffickers were using the Subject Hotels to engage in violations of 18 U.S.C §1591(a)(1) and 18 U.S.C §1591(a)(2), including the trafficking of Jane Doe (C.M.B.).

   b.   This venture violated the TVPRA through the conduct of the traffickers who repeatedly exploited victims, including Jane Doe (C.M.B.), in the rooms of the Subject Hotels.

   c.   Each Defendant knew or should have known Venture 1 engaged in violations of the TVPRA.

   d.   Each member of Venture 1 pursued the purpose of generating revenue through this continuous business relationship. Traffickers (including Jane Doe (C.M.B.)'s trafficker) rented rooms to earn profits by exploiting trafficking victims (including Jane Doe (C.M.B.)). Each Defendant received a financial benefit every time a trafficker rented a room.

   e.   Each Defendant participated in the venture by continually renting rooms to traffickers, creating a favorable environment for trafficking, and providing a venture where traffickers could continue their sexual exploitation with minimal risk of detection and disturbance, all the while ignoring the obvious signs of trafficking (including Jane Doe (C.M.B.)'s trafficking).

137.    **Venture 2:** Through acts and omissions more fully described throughout this Complaint, the Wyndham Defendants received a financial benefit from participating in Venture 2

with Franchisee Defendants operating the Subject Hotels. Each of the Wyndham Defendants violated the TVPRA through participation, as a beneficiary, in Venture 2 as follows:

a. Venture 2 is a commercial venture that resulted from the business relationship between the Wyndham Defendants during their respective time as franchisor for the Subject Hotels and Franchisee Defendants to operate the Subject Hotels with a common objective of maximizing revenue at the hotels, including gross room revenue.

b. The venture violated the TVPRA through the widespread sex trafficking that occurred at the Subject Hotels, including the trafficking of Jane Doe (C.M.B.).

c. The Wyndham Defendants, at the relevant time, knew or should have known Venture 2 was engaged in violations of the TVPRA.

d. The Wyndham Defendants knowingly benefited from this venture through management fees, royalty fees, reservation fees, marketing fees, and other ancillary fees from the operation of the Subject Hotels, which increased every time a room was rented, including rooms rented to traffickers.

e. The Wyndham Defendants, at the relevant time, participated in this venture by (1) continuing the ongoing business relationship with Franchisee Defendants despite actual or constructive knowledge the Subject Hotels were facilitating sex trafficking; (2) directly involving themselves in and supporting aspects of hotel operations that they knew or should have known were facilitating trafficking at the Subject Hotels; and (3) continuing to lend the perceived legitimacy of their brand and provide marketing services for the Subject Hotels after they knew or should have known the venture was engaged in violations of the TVPRA.

138. The ventures in which each Defendant participated were a direct, producing, and proximate cause of the injuries and damages to Jane Doe (C.M.B.).

**III. Count 3: Vicarious Liability for TVPRA Violations (Wyndham Defendants).**

139. Franchisee Defendants acted as the actual agents of the Wyndham Defendants when operating the Subject Hotels. The agency relationship between Franchisee Defendants and the Wyndham Defendants lasted for the period during which the Wyndham Defendants were involved in operation of the Subject Hotels through their role as franchisors.

53

140. Through the acts and omissions described throughout this Complaint, each Wyndham Defendant, at the relevant time, exercised or retained the right to exercise systematic and day-to-day control over the means and methods used by Franchisee Defendants to operate the Subject Hotels.

141. Under the TVPRA and the federal common law, a principal is vicariously liable for the violations of its actual agent and its subagents.

142. As a result of the relationship between Franchisee Defendants and the Wyndham Defendants, the Wyndham Defendants are vicariously liable for the acts of Franchisee Defendants, including at the Subject Hotels. Factors that support this allegation are that the Wyndham Defendants shared profits, standardized employee training, standardized the strict rules of operations, controlled pricing and reservations, regularly conducted inspections, operational support and control, and other acts described above. Finally, the Wyndham Defendants had the right to terminate either Franchisee Defendant that failed to comply with the requirements promulgated by the Wyndham Defendants. Thus, the Wyndham Defendants retained control, or the right to control, the mode and manner of work contracted for.

143. As alleged above, Franchisee Defendants are directly liable to Jane Doe (C.M.B.) for violations of the TVPRA as a beneficiary under 18 U.S.C §1595(a). The Wyndham Defendants are vicariously liable to Jane Doe (C.M.B.) for the same violation.

144. Each Defendant's failure to train and supervise their agents and employees, which was unreasonable in light of the known risk of sex trafficking at the Subject Hotels, enabled and contributed to the sex trafficking of Jane Doe (C.M.B.).

## DISCOVERY RULE

145. To the extent Defendants assert an affirmative defense of limitations, Jane Doe (C.M.B.) invokes the continuing tort doctrine because this lawsuit arises out of a pattern of continuous and ongoing tortious conduct by Defendants, individually and in concert, at the Subject Hotels.

146. To the extent Defendants assert an affirmative defense of limitations, Jane Doe (C.M.B.) invokes the doctrine of equitable tolling because, as a result of being a victim of trafficking, Jane Doe (C.M.B.) faced extraordinary circumstances, which arose through no fault of her own, that prevented her from filing a lawsuit, and those circumstances did not end more than 10 years before Jane Doe (C.M.B.) filed this lawsuit.

147. While under the control of her trafficker through at least December 21, 2015, Jane Doe (C.M.B.) did not have the freedom to investigate her claims, to identify those responsible, or to seek legal representation necessary to pursue her legal rights. Jane Doe (C.M.B.) could not have pursued her claims while under the active control of her trafficker despite the exercise of ordinary diligence.

148. While under the control of her trafficker, Jane Doe (C.M.B.) was subjected to extraordinary manipulation and coercion that produced lasting effects on her mental capacity that persisted throughout and well beyond the time she was actively trafficked. As a result of these effects, she could not—through the exercise of ordinary diligence—discover and pursue her legal rights.

149. Jane Doe (C.M.B.) was subject to continuous trafficking at the Subject Hotels through at least December 21, 2015, which is not more than 10 years before Jane Doe (C.M.B.) filed this lawsuit.

55

150.    This continuous trafficking resulted from Defendants' continuous facilitating of trafficking at the Subject Hotels and Defendants' ongoing venture with one another and with criminal traffickers.

**DAMAGES**

151.    Defendants' acts and omissions, individually and collectively, caused Jane Doe (C.M.B.) to sustain legal damages.

152.    Defendants are joint and severally liable for all past and future damages sustained by Jane Doe (C.M.B.).

153.    Jane Doe (C.M.B.) is entitled to be compensated for personal injuries and economic damages, including:

a.    Actual damages (until trial and in the future);

b.    Incidental and consequential damages (until trial and in the future);

c.    Mental anguish and emotional distress damages (until trial and in the future);

d.    Lost earnings and lost earning capacity (until trial and in the future);

e.    Necessary medical expenses (until trial and in the future);

f.    Life care expenses (until trial and in the future);

g.    Physical pain and suffering (until trial and in the future);

h.    Physical impairment (until trial and in the future);

i.    Emotional impairment (until trial and in the future);

j.    Exemplary/Punitive damages;

k.    Attorneys' fees;

l.    Costs of this action; and

m.    Pre-judgment and all other interest recoverable.

## JURY DEMAND

154.    Jane Doe (C.M.B.) demands a jury trial on all issues.

## REQUEST FOR RELIEF

WHEREFORE, Jane Doe (C.M.B.) prays that this case be set for trial before a jury and that, upon a final hearing of the cause, judgment be entered for Jane Doe (C.M.B.) against all Defendants jointly and severally for the actual, compensatory, and punitive damages as the evidence may show, and the jury may determine to be proper, together with the costs of suit, prejudgment interest, post-judgment interest, and such other and further relief to which Jane Doe (C.M.B.) may, in law or in equity, show herself to be justly entitled.

Dated:  May 30, 2025                           Respectfully submitted,

THE LOCKS LAW FIRM

*/s/ Francesca A. Iacovangelo*
Francesca A. Iacovangelo, Esq.
601 Walnut Street, Suite 720E
Philadelphia, PA 19106
(215) 893-3454
(215) 893-3444 Facsimile
*fiacovangelo@lockslaw.com*

57